THE CITY OF NEWARK, PLAINTIFF-RESPONDENT, AND
THE PORT OF NEW YORK AUTHORITY, PLAINTIFF-
APPELLANT AND CROSS-RESPONDENT, v. THE ESSEX
COUNTY BOARD OF TAXATION, DEFENDANT-RESPON-
DENT AND CROSS-APPELLANT, AND TOWN OF BELLE-
VILLE, *ET AL.*, INTERVENING DEFENDANTS-RESPON-
DENTS.

Argued May 5, 6, 1969—Decided June 25, 1969.

*Mr. Francis A. Mulhern* argued the cause for The Port of New York Authority (*Isobel E. Muirhead* of the New Jersey Bar, and *Messrs. Sidney Goldstein,* General Counsel to The Port of New York Authority, *Joseph Lesser* and *Harold J. Smith* of the New York Bar, of counsel).

*Mr. Norman N. Schiff* argued the cause for the City of Newark (*Mr. Philip E. Gordon,* Corporation Counsel, attorney).

*Mr. Charles H. Landesman,* Deputy Attorney General, argued the cause for The Essex County Board of Taxation (*Messrs. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Elias Abelson,* of counsel).

*Mr. Saul A. Wolfe* argued the cause for the intervening defendants-respondents (*Messrs. Skoloff and Wolfe,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Law Division held that a goodly portion of the real property at the Port Newark terminal owned by the City of Newark and leased to The Port of New York Authority was subject to local property taxation. *City of Newark, et al. v. Essex Cty. Bd. of Taxation,* 103 *N. J. Super.* 41 (1968). The Port of New York Authority appealed to the Appellate Division from that part of the Law Division's judgment which designated much of its leased property as not exempt and the Essex County Board of Taxation cross-appealed from that part which designated some of the leased property as exempt. We certified the matter before it was argued in the Appellate Division. *R. R.* 1:10–1.

The lower court recognized, as do we, that the pertinent history should be examined and evaluated for the light it may properly shed on the legislative contemplation. 103 *N. J. Super.,* at 45–48; *Lloyd v. Vermeulen,* 22 *N. J.* 200, 206 (1956); *Hudson County News Co. v. Sills,* 41 *N. J.* 220, 226 (1963), *appeal dismissed,* 378 *U. S.* 583, 84 *S. Ct.* 1914, 12 *L. Ed. 2d* 1036 (1964). As early as 1911 the Legislature adopted a resolution which referred to the fact that our communities were exercising local control over their waterfront facilities without any coordination with other communities, and which requested the Governor to appoint commissioners to act with others in formulating proposals for the development and management of the Port of New York. Jt. Res. No. 3, *Laws of* 1911, *p.* 840. The Governor did appoint such commissioners and in February, 1914 they

submitted a preliminary report which recommended the creation of a permanent State agency with well defined powers over "the waterfront and waterways in the State". New Jersey Harbor Commission, *Fourth Preliminary Report* 8 (1914). In the course of their report, the commissioners referred to the trend towards public control of waterfront facilities in the United States, as well as in foreign countries, and noted that considerable legislation had been "passed by States and cities, creating public bodies to control and develop the waterfront, not only with respect to docks and piers, but also to belt-line railroads, storage and warehousing accommodations and the other things which go to make up a terminal." *Fourth Preliminary Report, supra,* at 37–38. In April, 1914 an act was passed formally creating the New Jersey Harbor Commission and defining its power and duties. See *L.* 1914, *c.* 123; New Jersey Harbor Commission, *Annual Report* (1915).

In 1916 the Legislature adopted a referendum act which authorized cities fronting on tidewater "to establish municipal docks, warehouses and shipping and industrial facilities, and to operate or lease the same in whole or in part". *L.* 1916, *c.* 162 (*R. S.* 40:179–58 *et seq.*). During the following year the Governor strongly supported the development of marine terminals through public ownership and the Legislature again adopted a referendum act authorizing any city fronting upon navigable waters "to establish docks, warehouses, ferries, terminals and shipping and industrial facilities" and to operate such facilities or lease them for terms of years. *L.* 1917, *c.* 127 (*R. S.* 40:179–46 *et seq.*). This legislation expressly provided that every terminal erected pursuant to its provisions "and every interest or estate therein, shall, during the term of any lease thereof made as herein provided, be exempt from all taxes and assessments within this State". *L.* 1917, *c.* 127, § 10 (*R. S.* 40:179–55).

In 1920 the Legislature adopted the so-called industrial terminal act which substantially reenacted the 1917 act

including its provision for tax exemption but omitting its referendum requirement. *L.* 1920, *c.* 176 (*R. S.* 40:179–34 *et seq.*). *See R. S.* 40:179–42. Under the authority of the foregoing legislation, Newark developed a marine terminal complex in the Port Newark area. *See Shea v. Ellenstein,* 118 *N. J. L.* 438 (*Sup. Ct.* 1937); *American Agricultural Chemical Co. v. Murphy,* 136 *N. J. L.* 193 (*E. & A.* 1947). The terminal covered approximately 700 acres of land and included wharves, warehouses and other buildings, along with open spaces, which were leased to private tenants engaged in receiving, storing, processing and distributing products of varying nature. Admittedly all of the leased real property thus used at the terminal was exempt from local taxation under *R. S.* 40:179–42 and *R. S.* 40:179–55.

In the meantime there were significant developments concerning the creation and activities of the Port of New York Authority. In 1917 the Legislature provided (*L.* 1917, *c.* 130) that the Governor shall appoint commissioners to meet with New York commissioners and recommend the policy to be pursued in developing the Port of New York. Three years later the commissioners submitted the results of their extensive studies. *See* New York, New Jersey Port and Harbor Development Commission, *Joint Report with Comprehensive Plan and Recommendations* (1920). They pointed to the serious economic penalties which result from inadequate and incomplete terminal facilities and recommended the adoption of a compact between New Jersey and New York establishing a port district and creating a permanent interstate agency for development of the port. In 1921 the Legislatures of New Jersey and New York authorized the execution of the port compact (consented to by Congress 42 *Stat.* 174 (1921)) establishing the Port of New York district and creating the Port of New York Authority as their joint agency. *L.* 1921, *c.* 151; *Laws of N. Y.* 1921, *c.* 154. *See R. S.* 32:1–1 *et seq.* The 1921 compact vested the agency with full power to construct, lease and operate any terminal facility within the port of New York district and defined

"terminal facility" to include wharves, piers, docks, warehouses, cold storage, etc., "and every kind of terminal or storage facility now in use or hereafter designed for use for the handling, storage, loading or unloading of freight at steamship, railroad or freight terminals". *R. S.* 32:1–23.

In 1922 New Jersey and New York adopted a comprehensive plan for the development of the port district. *L. 1922, c. 9; Laws of N. Y. 1922, c. 43. See R. S.* 32:1–25 *et seq.; Bard, The Port of New York Authority* 35–62 (1942). The plan provided, *inter alia,* that terminal operations within the port district should be unified insofar as economically practicable; that there should be consolidation of shipments so as to eliminate duplication of effort and inefficient loading of equipment; and that there should be the most direct routing of all commodities so as to avoid centers of congestion, conflicting currents and long truck hauls. *R. S.* 32:1–26. Though the 1921 and 1922 legislation contained no express provision for tax exemption there is little reason to doubt that such was the legislative purpose. In any event, in 1931 the New Jersey Legislature provided (*L. 1931, c. 69; R. S.* 32:1–144 *et seq.*), as did the New York Legislature by complementary enactment (*Laws of N. Y. 1931, c. 553*; Unconsol. Laws §§ 6971–6973 (McKinney 1961)), that in order to relieve municipalities of undue loss of taxation because of Port of New York Authority acquisitions, the Authority shall have power "in connection with any marine or inland terminal property owned by it" to make voluntary payments to municipalities in reasonable amounts not exceeding the sums last paid as taxes on the property prior to its acquisition by the Authority. In *Port of N. Y. Authority v. City of Newark,* 20 *N. J.* 386 (1956), this Court, citing *Bush Terminal Co. v. City of New York,* 282 *N. Y.* 306, 26 *N. E. 2d* 269 (1940), pointed out that the Legislatures of both New Jersey and New York must have considered the Authority's marine and inland terminal property to be tax exempt; otherwise there would have been no need for relief

to the local municipalities by way of *L.* 1931, *c.* 69, described as the "in-lieu-of" tax statute. 20 *N. J.*, at 393.

Throughout the years, Newark's efforts to develop its seaport had proven very costly to its taxpayers and at the close of the second world war, during which period the seaport had been used by the Government for military purposes, it was in critical need of rehabilitation and reconstruction. At the request of Newark's Central Planning Board, a study of Newark's marine and air terminals was made by the Harland Bartholomew firm which submitted its preliminary report in 1945. In that report it was pointed out that "to date, Port Newark has cost the taxpayers approximately $9,600,000" and continued city operation would not avoid "long periods of substantial annual deficits". The possibility of having the seaport, along with Newark's airport, operated by private parties, in which event they would be subject "to full taxation", was mentioned but the report recommended instead that they be placed in the hands of an independent public agency such as the Port of New York Authority which appeared "to possess the best possibilities for Newark." In 1945 Newark requested the Port of New York Authority to undertake "a thorough study of all matters with relation to Port Newark and Newark Airport, to the end that the said Port of New York Authority may make to the City of Newark a proposal concerning the possibility of its undertaking the management and administration of the said Port Newark and Newark Airport."

Pursuant to Newark's request, the Port of New York Authority conducted a survey and presented a report. *See Development of Newark Seaport and Airport* (1946). It proposed extensive rehabilitation of the marine terminal area including the redredging of the channel, the rehabilitation of the existing wharves, buildings, pavements and trackage and the providing of new transit sheds, bulkheads, wharves, warehouses, industrial space and "other appropriate and needed facilities". At one point in the report the tenants who would use the facilities were described as

"handlers, storers" and "processors" of commodities. At another point, the report indicated that "shipping lines, lumber companies and distributors of a wide variety of commodities" were awaiting the availability of space at the marine terminal, and in detailing the benefits to be received from the port development the report referred to the fact that "personal property taxes" from tenants in the terminal area would increase. *See R. S.* 54:4–9 *et seq.* There was no suggestion whatever of real property taxes except in the proposed agreement submitted by the Authority under which the city would transfer to the Authority "the existing marine and air terminal facilities" for five million dollars, the Authority to provide up to seventy-one million dollars for improvements and to pay the city one hundred thousand dollars annually "in lieu of taxes".

The Authority's proposal was supported by the local Chamber of Commerce which anticipated benefits in the form of expanded business, increased employment and "personalty assessments and taxes". Similarly the local Merchants Association referred to increased personal property yields from the proposed development. The newspapers in substantial measure supported the Authority's tender and stressed the advantage to Newark's taxpayers in having the city unburden itself of its deficit operation. However, the city officials were apparently displeased with the terms of the Authority's proposed agreement of purchase and in September, 1946 the Authority submitted a revised offer of purchase which also fell by the wayside. In December, 1946 the Authority offered to lease the Newark ports on term comparable to its leasehold offered to New York City for its airports which contemplated a ninety-nine year term lease with the city to receive half the net revenues. While the Authority lease offers were pending and in negotiation, bills were introduced in New Jersey, as well as New York, to facilitate the Authority's development of marine and air terminals. A public hearing on the bills was held on March 17, 1947 in the New Jersey Senate Chamber and during the course thereof

an Authority representative indicated that payment to Newark would be made as a matter of rental rates "in lieu of taxation". A railroad representative appeared at the hearing, apparently to suggest that the broad tax exemption being afforded to the Authority might operate unfairly as against railroad transportation facilities.

The bills were passed and the one which related particularly to marine terminals became *L*. 1947, *c*. 44; *R. S.* ·32 :1–35.28 *et seq. See also Unconsol. Laws* §§ 6671-6678 (McKinney 1961). The statement attached to it referred to .Newark's negotiations with the Authority with respect to its marine terminal and set forth that its. purpose was to implement the power of the Authority and municipalities within the port district "to go forward with the plans now in process of preparation if the municipalities or any of them so desire". The bill as enacted empowered any municipality within the port district to consent to the Authority's use of any marine terminal owned by the municipality or of any ·real or personal property owned by the municipality and "necessary, convenient or desirable in the opinion of the Port Authority for marine terminal purposes" and empowered the municipality to "grant, convey, lease or otherwise transfer to the Port Authority any such marine terminal or real or personal property". *R. S.* 32 :1–35.31. A marine terminal was defined as a development consisting of piers, wharves, docks, bulkheads, slips, basins, vehicular roadways, railroad connections, side tracks, sidings "or other buildings, structures, facilities or improvements, necessary or convenient to the accommodation of steamships or other vessels and their cargoes or passengers". *R. S.* 32 :1–35.30. Marine terminal purposes were defined to mean "the effectuation, establishment, acquisition, construction, rehabilitation, improvement, maintenance or operation of marine terminals." The Legislature in section five of the bill explicitly directed that that section and its preceding sections shall be supplementary to the 1921 compact between New Jersey and New York "and shall be liberally construed to

effectuate the purposes of said compact and of the comprehensive plan heretofore adopted by the two States pursuant thereto". *R. S.* 32:1–35.32.

Shortly after the adoption of *L.* 1947, *c.* 44 (*R. S.* 32:1–35.28 *et seq.*) Newark and the Authority entered into their basic agreement with respect to the Newark marine and air terminals. It was dated October 22, 1947, effective March 22, 1948, and set forth a leasing arrangement under which Newark leased its ports to the Authority for a term up to fifty years "for marine and air terminal purposes and incidental purposes". The rental was fixed substantially at $128,000 per annum or a division of net revenues, 75% to the city, 25% to the Authority, whichever was greater. The lease obligated the Authority to assume the city's long term real property leases and also provided that the Authority would "rehabilitate, improve and develop the Newark Marine Terminal" by, *inter alia,* "rehabilitating the existing wharves, buildings, pavements, and trackage" and by providing new transit sheds, bulkheads and wharves and "new public warehouse spaces, and other appropriate and needed facilities". The lease did not mention taxes but there is no question that both the city and the Authority contemplated that the historic tax exemption of the real property would continue so long as it was part of the marine terminal operation; nor is there any doubt that they contemplated a modern, efficient marine terminal which would include not only adequate water berths, transit sheds and transportation facilities, but also adequate areas dedicated to the storage, processing, servicing and distribution of water-borne cargo.

After taking over the operation of the Newark marine terminal, the Authority proceeded with its rehabilitation plans and admittedly converted it into a vibrant, modern seaport which has brought economic benefits not only to the immediate area but also to the State as a whole. The Authority's Director of marine terminals, Mr. Albert Lyle King, testified before the Law Division that in his concept a marine terminal

may be viewed as "a complex of wharves, warehouses, open land and miscellaneous buildings for the purpose of generating and transferring cargo between land and water carriers and providing facilities for servicing, processing, and distributing cargo". Acting on this concept, the Authority geared its policy towards terminating those city leases with tenants whose business did not serve to generate waterborne cargo and towards entering into new leases with proper tenants. In Mr. King's language, the tenant "must have substantial amounts of cargo moving in and out by water". At the time of the hearing in the Law Division it appeared that, apart from an isolated instance, all of the buildings and lands at the terminal which were being used for the storage, processing and distribution of merchandise were concerned principally with waterborne products.

For over a decade the Authority continued its development of the marine terminal without interruption and without any legal attack on the tax exempt status of the real property at the terminal which it held under lease from the city. *See Lloyd v. Vermeulen, supra,* 22 *N. J.,* at 210; *State Department of Civil Service v. Clark,* 15 *N. J.* 334, 341 (1954). In 1960 the city took the position that certain portions of the leased property were not being used for marine terminal purposes and should therefore be subject to taxation. It applied to the Essex County Board of Taxation to list the properties in question on the tax rolls as omitted assessments. The Board determined that the properties should be assessed, with the Port of New York Authority listed as "owner". This produced appeals and further litigation which became snarled procedurally and which resulted in an order of this Court remanding all phases of the controversy to the Law Division for a *de novo* hearing and determination. *Port of N. Y. Auth. v. Essex Co. Bd. of Taxation,* 46 *N. J.* 51 (1965).

After the remand, the city and the Authority made a settlement under which the annual rental payable by the Authority to the city was increased from $128,000 to $1,000,000, with a provision for additional rental upon a formula based on net

revenue. The settlement agreement provided that if the city or the Authority should become liable for payment of taxes to the county, the Authority would make the payment and include it in its operation and maintenance expense. Finally, it was stipulated that all litigation between the parties would be dismissed with prejudice, and that the city would designate all of the leased properties on its tax records as tax exempt. In due course this was done. *See* 103 *N. J. Super.*, at 48.

In reviewing the city's assessment lists of taxable property for 1967, the Essex County Board of Taxation concluded that certain of the properties leased to the Authority were not used for "marine terminal purposes" but were subleased "to private business concerns for the purpose of producing revenue." It directed that they be placed in non-exempt status and that Newark change its lists accordingly. The city complied and thereafter the Authority filed its complaint seeking a declaration as to whether the properties were being used for marine terminal purposes and were tax exempt; Newark joined as a party plaintiff and other Essex County municipalities were permitted to intervene. A full trial was held in the Law Division which found that the properties leased by the city to the Authority were tax exempt to the extent that they were being used for marine terminal purposes within the contemplation of *L.* 1947, *c.* 44 (*R. S.* 32:1–35.28 *et seq.*) *See* 103 *N. J. Super.*, at 52–55. However, in determining what were such marine terminal purposes it took a much narrower view than that expressed by Mr. King on the Authority's behalf.

The Law Division classified the properties under the following headings: (a) transit functions, temporary storage and supporting services; (b) warehousing; (c) sales and delivery of merchandise; (d) processing and manufacturing; (e) miscellaneous. Within (a) were various activities very intimately connected with the loading and unloading of vessels including temporary storage in transit sheds and elsewhere, ship and cargo container repairs, etc. Included within (b) were warehouses where lumber, plastics,

coffee and numerous other products, largely waterborne, were stored for indefinite periods of time pending delivery to consignees and customers. Included within (c) were land and buildings used by carriers, importers, etc., for storing largely waterborne inventories for sale and delivery. Included within (d) were lands and buildings where products, largely waterborne, such as lumber, steel, wine, etc., were processed for ultimate distribution. The miscellaneous grouping (e) included a few vacant properties and service buildings such as banks, a restaurant and premises of the Port of New York Authority, The United States Department of Customs and the Waterfront Commission.

Though the Law Division determined that all of the properties in category (a) and some in (e) were exempt, it held that none of the properties in (b), (c), and (d) was exempt. 103 *N. J. Super.*, at 61. In main effect it concluded that only those properties which were devoted to short-term incidental storage or to essential ship-related services were proper marine terminal purposes within the statutory contemplation. Thus the important facilities for warehousing, processing and distributing which were fostered by the Authority to reduce the high terminal costs involved in the transshipment of waterborne cargo were the very ones determined by the Law Division to be outside the scope of the statutory "marine terminal purposes". In holding that warehousing was not one of the marine terminal purposes, the Law Division expressed the thought that the "only justification for the location of the warehouse at the Port is the fact that the stored goods are in the main waterborne, and the existence of these buildings near the piers serves as an economic advantage to the company." But that economic advantage represents the difference between that waterborne cargo coming to the Newark terminal rather than some other terminal, and, as Mr. King pointed out, if a modern marine terminal is to be operated efficiently and successfully it must afford some such economic inducements.

Throughout its opinion the Law Division expressed strangely restrictive notions as to what were proper marine terminal purposes within the statute. Thus, in responding to the Authority's suggestion that a wholesale lumber yard is appropriate in a marine terminal because it involves a waterborne commodity of such size and bulk as to make it impractical to locate outside the port area, the Law Division expressed the thought that "the conduct of a lumber yard * * * has no necessary or convenient nexus with the accommodation of cargoes or vessels". Similarly it expressed the view that warehouses, though they may be concerned only with waterborne goods, "are not necessary or convenient to the accommodation of vessels or their cargoes". Foreign importers and exporters were found by it to be "not engaged in any activity which aids the flow or movement of cargo" and therefore "not within the statutory purposes of a marine terminal". A company, receiving wine in bulk directly from ships which pumped the wine into the company's own storage tanks for later bottling, was found by it to be in a business "not associated with a marine terminal involving the movement of waterborne cargo". And a restaurant within the area, frequented mainly by the local employees, was said by the Law Division to be not "reasonably necessary for the operation of a marine terminal".

Although the history and contemporaneous construction of the Marine Terminal Act (*L.* 1947, *c.* 44; *R. S.* 32:1–35.28 *et seq.*) strongly support the conclusion that the Legislature contemplated tax exemption of the Port Newark properties devoted to marine terminal purposes, reference must be made to *R. S.* 54:4–3.3 for express authority for the exemption. That long standing statute provides that publicly-owned properties "used for public purposes" shall be tax exempt. In *Township of Hanover v. Town of Morristown,* 4 *N. J. Super* 22 (*App. Div.* 1949) the court was called upon to determine whether an airport belonging to the Town of Morristown but operated with some leases and concessions

was tax exempt under *R. S.* 54:4–3.3. In the course of his opinion favoring the exemption, Judge Bigelow said:

> While an exemption from taxation granted to a private institution is strictly construed, the contrary is true of the exemption held by political bodies, since the latter are not taxed in a doubtful case. So the phrase "used for public purposes" should be liberally construed; it probably includes any municipal enterprise which the legislature has authorized. An airport is clearly a public purpose. *R. S.* 40:8–1, etc. The circumstance that Morristown leases hangar space and the right to service airplanes at the airport, and the fact that the town has conducted the enterprise at a small profit, do not detract from the public character of the airport.

4 *N. J. Super.*, at 24.
See *Walter Reade, Inc. v. Dennis Tp.*, 36 *N. J.* 435, 439–441 (1962).

In the case at hand, the Law Division determined that *R. S.* 54:4–3.3 was applicable and that the Port Newark properties, to the extent that they were used for marine terminal purposes, were exempt from taxation as publicly owned properties devoted to public use. 103 *N. J. Super.*, at 52. In their briefs before us, the Authority, the County Board and the City of Newark have all expressed their full agreement with this determination although they have pursued their differences as to what properties were being used for marine terminal purposes. Indeed the only dissent as to the applicability of *R. S.* 54:4–3.3 comes from the intervening municipalities which have advanced the contention that "with the exception of the properties occupied by the Port Authority, U. S. Customs, the Waterfront Commission, and perhaps the transit sheds * * *, none of the property is devoted to use for public purposes". They apparently rely, though mistakenly, on cases such as *Jamouneau v. Division of Tax Appeals*, 2 *N. J.* 325 (1949), *Borough of Moonachie v. Port of N. Y. Authority*, 38 *N. J.* 414 (1962), and *Todd Shipyards Corp. v. Weehawken Tp.*, 45 *N. J.* 336 (1965).

In *Jamouneau* the City of Newark leased premises to a private concern which built a factory for its own operation.

Insofar as the city was concerned there was no public purpose other than receipt of the rental. In rejecting the contention that the property was tax exempt under *R. S.* 54:4–3.3, the Court pointed out that "the use was exclusively private and commercial; there was neither vestige of a present public use nor prospect of a future public use within the term of the lease." 2 *N. J.*, at 330. This is in clear contrast to the Port Authority's position here that its public purpose is to operate the Port Newark marine terminal and that its leases, though they incidentally bring in revenue, are primarily and firmly designed to further the continuing development of the marine terminal as such.

In *Moonachie* the Port of New York Authority built a plant on its land at Teterboro Airport and leased it to a screen and storm window factory for twenty years. The purpose of the lease was revenue rather than the development of the airport. In rejecting a claimed tax exemption for the factory building, this Court noted that "a tax exemption based upon a statute specifying a particular public use is clearly lost when the use to which the property is put is foreign to the prescribed use and the revenue motive in adopting the use is the primary or exclusive one." 38 *N. J.*, at 427. In *Todd Shipyards* property leased by the Government "for private purposes, and not to further a public purpose of the federal government" (45 *N. J.*, at 346) was held taxable. Commenting on *R. S.* 54:4–2.12, which deals with the taxation of leaseholds but specifically exempts property leased to interstate agencies such as the Port of New York Authority, this Court described the holding in *Moonachie* in terms which pointedly differentiate it from the case now before us:

Subsection (1) of *section* 10 deals with interstate agencies. As to such agencies, we have held that a lease for private use as distinguished from a lease to private operators in furtherance of the public purpose for which the exemption was granted or a lease incidental to achieving that public purpose, will result in taxation. *Moonachie, Borough of, v. Port of New York Authority*, 38 *N. J.* 414, 185 *A. 2d* 207 (1962). This holding was in keeping with an earlier decision that

the exemption was not lost where the lease was made to serve essentially the public purpose the agency was authorized to further. *Port of New York Authority v. City of Newark*, 20 *N. J.* 386, 120 *A. 2d* 18 (1956).

45 *N. J.*, at 344.

 We agree entirely with the Law Division that there is no longer any basis for doubting that a legislatively authorized marine terminal is a "public purpose" within pertinent constitutional and statutory provisions. 103 *N. J. Super.*, at 55. *See Port of N. Y. Authority v. City of Newark, supra,* 20 *N. J.* 386; *Port of N. Y. Authority v. Hackensack Waler Co.*, 41 *N. J.* 90 (1963). In the former case this Court held that a truck terminal, built by the Port of New York Authority and leased to the Air Force, was being used for public purposes and was tax exempt (20 *N. J.*, at 396–397) ; and in the latter case it described, in passing, the terminal facilities in Port Newark as being "in the public use". 41 *N. J.*, at 95. *See Roe v. Kervick*, 42 *N. J.* 191 (1964) :

The concept of public purpose is a broad one. Generally speaking, it connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare. *Hoglund v. City of Summit, supra* (28 *N. J.*, at *p.* 549) ; *DeArmond v. Alaska State Development Corporation*, 376 *P. 2d* 717 (*Alaska Sup. Ct.* 1962) ; *City of Frostburg v. Jenkins*, 215 *Md.* 9, 136 *A. 2d* 852, 855 (*Ct. App.* 1957) ; *Opinion to the Governor*, 76 *R. I.* 249, 69 *A. 2d* 531 (*Sup. Ct.* 1949) ; *Rhyne, Municipal Law*, § 15–4, *p.* 341 (1957).

42 *N. J.*, at 207.
*See also City of Trenton v. Lenzner*, 16 *N. J.* 465, 469–470 (1954), *cert. denied*, 384 *U. S.* 972, 75 *S. Ct.* 534, 99 *L. Ed.* 757 (1955).

In *Courtesy Sandwich Shop v. Port of N. Y. Authority*, 12 *N. Y. 2d* 379, 240 *N. Y. S. 2d* 1, 190 *N. E. 2d* 402, *appeal dismissed*, 375 *U. S.* 78, 84 *S. Ct.* 194, 11 *L. Ed. 2d* 141 (1963),

the New York Court of Appeals upheld the law which authorized the Port of New York Authority to condemn land for the development of the World Trade Center in lower Manhattan. In rejecting a contention that the Center did not satisfy the requirement of public purpose, the Court said:

The Appellate Division has stated that the concept of the World Trade Center is a public purpose. We understand this to mean that any use of the property sought to be condemned that is functionally related to the centralizing of all port business is unobjectionable even though private persons are to be the immediate lessees. The "concept" referred to by the Appellate Division can mean only that. It is the gathering together of all business relating to world trade that is supposed to be the great convenience held out to those who use American ports and which is supposed to attract trade with a resultant stimulus to the economic well-being of the Port of New York. This benefit is not too remote or speculative as to render the means chosen to achieve it patently unreasonable; nor is the benefit sought itself an improper concern of government. The history of western civilization demonstrates the cause and effect relationship between a great port and a great city. (See Pirenne, Economic and Social History of Medieval Europe, [Harcourt, Brace & Co., N. Y.].) Fostering harbor facilities has long been recognized by this court as the legitimate concern of government. (Matter of Mayor of City of N. Y., 135 *N. Y.* 253, 31 *N. E.* 1043.)

240 *N. Y. S. 2d,* at 5, 190 *N. E. 2d,* at 405.
*See Lerch v. Maryland Port Authority,* 240 *Md.* 438, 214 *A. 2d* 761 (1965).

*Town of Harrison v. County of Westchester,* 13 *N. Y. 2d* 258, 246 *N. Y. S. 2d* 593, 196 *N. E. 2d* 240 (1963) is relied upon by the Essex County Board of Taxation but it does not at all impair the Authority's position before us. There the County of Westchester leased premises to a private company to operate it as a public airport. The company leased two of its hangars for long periods of time to private companies for their exclusive private uses. The Court of Appeals held that, although the airport was tax exempt to the extent that it was used for service to the public, the two hangars leased to the private companies were not tax exempt. The court distinguished the *Courtesy Sandwich Shop, supra,* as involving condemnation rather than taxation and

concluded, solely as a matter of statutory construction, that the New York Legislature did not intend to exempt parties using hangars for their own private purpose and not for "any other purpose redounding to the benefit or advantage of the general community." 13 *N. Y. 2d,* at 263, 246 *N. Y. S. 2d,* at 597, 196 *N. E. 2d,* at 243. But, as has already been pointed out, there is every indication that the New Jersey Legislature did intend that the properties at Port Newark should be tax exempt so long as they were being used, as the Authority asserts they were here, in furtherance of the public-purposed marine terminal contemplated by the statute. If they were being so used, then clearly any incidental benefits to the private lessees of the Authority would neither impair the public purposes nor remove the tax exemption. *See Walter Reade, Inc. v. Dennis Tp., supra,* 36 *N. J.,* at 439; *Bloomfield v. Div. of Tax Appeals,* 84 *N. J. Super.* 19 (*App. Div.* 1964) ; *cf. Clayton v. Kervick,* 52 *N. J.* 138, 155 (1968) ; *see also Orbison v. Welsh,* 242 *Ind.* 385, 179 *N. E. 2d* 727 (1962); *Carney v. Ohio Turnpike Commission,* 167 *Ohio St.* 273, 147 *N. E. 2d* 857 (1958) ; *Visina v. Freeman,* 252 *Minn.* 177, 89 *N. W. 2d* 635 (1958).

We come now to the ultimate question as to whether the properties were actually being used for marine terminal purposes within the meaning of the statute. Mr. King testified that after the Authority took over the marine terminal complex from Newark it proceeded with efforts to relocate certain lessees and terminate certain leases, all with a view towards generating waterborne traffic and rehabilitating the terminal as contemplated by the statutory authorization for its transfer. Thus lessees who were preempting valuable wharf space for their own private merchandise were, to the extent possible, relocated to enable the movement of mass volumes of public cargoes. And lessees whose businesses did not primarily involve waterborne traffic had their leases terminated as soon as possible. So far as the leasing policy of the Authority was concerned, Mr. King testified that no

leases would be executed unless the tenant was substantially connected with waterborne traffic and had substantial amounts of cargo moving in and out by water. So far as the warehousing and industrial activities relating to the water-borne products were concerned, he testified that the Authority's policy was to require reasonably rapid turnovers, to permit processing or fabricating as distinguished from complete manufacturing, and to permit ship and container servicing along with other servicings necessary or convenient and incidental to the effective operation of the terminal. He observed that the activities at Port Newark were normal marine terminal activities throughout the world; and he gave the following illustration of the close relationship between the terminal area's transit and storage or industrial functions:

Well, take, for example, if you want to use this as an illustration, the frozen meat, which amounts to 150,000 tons of imported meat through Port Newark every year. This has been a very, very highly competitive movement, with the Ports of Norfolk, Baltimore, Philadelphia and Jacksonville all trying to get it, all building ware-houses as close to the water as they could get them, and all quoting the lowest possible rates and all to take those ships out of the Port of New York, and they very nearly did. As a matter of fact, they took a half dozen of them before we could catch up to it fast enough to get a cold storage warehouse built in Port Newark and then, having gotten that warehouse, we got our ships back where they belonged before we had any further losses. But there was a case where it was absolutely imperative competitively to hold that shipping and all of those ships, which is a lot of shipping a year, absolutely imperative that a cold storage plant be in that port area.

As to the trucking differential, believe me, we made all kinds of studies of trucking costs. The trucking differential between handling from a transit shed in Port Newark to the cold storage plant in the industrial section of Port Newark, compared to trucking it to any cold storage warehouse in Newark or elsewhere in the Port of New York, the difference was better than six dollars a ton, and it completely wipes us out. We had to put that warehouse in there to hold that shipping. Those ships represented an awful lot of jobs a year and an awful lot of money into the City of Newark and its business firms each year.

The record firmly establishes the Authority's high goals and the broad effectiveness of its expanding activities. It has

invested well over a hundred million dollars to date and has converted the terminal into one of the nation's great seaports. Its determinations from time to time as to what activities should be initiated or continued within the terminal area have involved exercises of discretion but there is nothing to suggest anything other than conscientious exercises which fit well within Mr. King's commercial definition and the common understanding of what a modern marine terminal should fairly encompass. By 1967 all but two of the storage and distribution facilities in the terminal area serviced primarily waterborne cargo and since then, one of the two is no longer located there. The other has been experiencing severe reductions in its waterborne traffic and if that course is not reversed it may safely be assumed that its lease will not be renewed. The properties which are being used for purposes such as ship and container repair, service accommodations to passengers, employees and others in the area, etc., have also been fairly considered by the Authority to be reasonably necessary or convenient to the operation of a modern terminal. And while the evidence is rather meagre as to the few vacant properties, Mr. King testified that the only vacant properties were "those that happen to be in between moves" and they may fairly be viewed as merely incidental to the ordinary operation of the terminal. *Cf. Borough of Moonachie v. Port of N. Y. Authority, supra,* 38 *N. J.,* at 428.

The Law Division did not question the Authority's goals or the economic benefits which are being brought to the State and its people by its activities at Port Newark. It did, however, consider it incumbent upon itself "to control the expansion of port authority activities via the route of tax exemption" by limiting the exemption "to those uses and purposes which are clearly within the legislative intendment." 103 *N. J. Super.,* at 60. It then proceeded to find that such uses and purposes included only the transit sheds and the essential ship-related services and not the buildings devoted to the warehousing, processing and distribution of waterborne cargo. It appears clear to us that this highly narrowing find-

ing as to the legislative intendment ran directly counter to the recorded statutory history and terminology and must now be rejected.

It is significant that the Law Division could cite no supporting statutory provision which it might fairly say departed from the expansive grant of delegated legislative power and tax exemption evidenced by the historical materials and the legislative provisions outlined earlier in this opinion. As has already been pointed out, the 1921 compact sweepingly defined terminal facilities to include "warehouses" and all kinds of terminal or storage facilities then used or thereafter designed for the "handling, storage, loading or unloading of freight" at steamship terminals. *R. S.* 32:1–23. The 1947 compact, explicitly executed to enable the rehabilitation and expanded operation of the Port Newark terminal complex which then contained warehousing, processing and distribution facilities, embodied definitions of "marine terminals" and "marine terminal purposes" which were broad and flexible rather than narrow and fixed and are to be liberally construed. *See R. S.* 32:1–35.30; *R. S.* 32:1–35.32; *cf. Application of Waterfront Comm. of N. Y. Harbor,* 39 *N. J. Super.* 33, 39 (*Law Div.* 1956).

Marine terminal purposes were defined to include the acquisition, rehabilitation, improvement and operation of marine terminals, and, in turn, marine terminals were defined to include developments consisting of wharves, docks, etc. and other buildings, structures, facilities or improvements "necessary or convenient to the accommodation of steamships or other vessels and their cargoes or passengers". The use of the disjunctive in the phrase "necessary or convenient" stresses the breadth of the legislative contemplation; and the use of comparable phrases throughout the 1921 and supplemental compacts evidences the legislative design to afford comprehensive discretionary powers to the Authority in order that it may successfully carry out its mandates with respect to the operation of the port district. *See, e. g., R. S.* 32:1–23; *R. S.* 32:1–33; *R. S.* 32:1–35.3;

*R. S.* 32 :1–35.19; *R. S.* 32 :1–35.28; *R. S.* 32 :1–35.33; *R. S.* 32 :1–35.35; *R. S.* 32 :1–35.52; *R. S.* 32 :1–35.57; *R. S.* 32 :1–132; *R. S.* 32 :1–38; *R. S.* 32 :1–73; *R. S.* 32 :1–96.

We are firmly convinced that the statutory definitions, particularly when read with the impelling history, furnish more than adequate legislative support for the Authority's entire operation at the Port Newark terminal complex. The transit functions, the warehousing, processing and distribution activities, and the service buildings all fit well within the statutory reference to facilities and improvements necessary or convenient to the accommodation of steamships or other vessels and their cargoes or passengers; and such further incidental uses as were referred to in the record before us were not incompatible with the overall furtherance of the operation of the marine terminal and were within the broad discretionary powers of the Authority. All in all we find that the properties at the terminal were without exception used for statutorily authorized purposes, were tax exempt as publicly-owned property devoted to public purposes, and that the Law Division's judgment must be modified accordingly.

■■ The Law Division expressed concern with the increasing removal of real property by public agencies from the tax rolls of local government. It referred to the "severe impact of such public agency encroachment upon the tax structures of our municipalities" and sought to limit the Authority's tax exemption through a judicial "form of braking action". 103 *N. J. Super.,* at 54. In response, the Authority stresses that the land on which the physical facilities at Port Newark have been constructed was originally marsh land and was not put to productive use until the Port was developed; that the Authority's takeover of the Port relieved Newark of a crushing financial burden and now returns to it, under the settlement arrangements between them, a minimum of $1,000,000 per year in rental payments; and that the other communities in Essex County as well as

194

in the State as a whole have greatly benefited and are greatly benefiting from the Authority's progressive and expanding commercial development of the Port. However, none of the foregoing appears to be properly addressed to this Court for we, as judges, are not concerned with the wisdom or unwisdom of any statutory grant of tax exemption or with its continuation or termination. Finding, as we have, that the Legislature granted a tax exemption for the entire Port Newark terminal operation, our clear duty, absent a showing of constitutional infirmity, is to apply it. Any concern with the breadth of the exemption and any movement for its restriction must, under our form of government, be addressed to the Legislature rather than the Judiciary. *See Arrow Builders Supply Corp. v. Hudson Terrace Apts., Inc.,* 15 *N. J.* 418, 420–421 (1954) ; *Matawan Borough v. Monmouth Cty. Tax Bd.,* 51 *N. J.* 291, 298 (1968).

Modified.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.