BRENNAN, J.T.C.
Plaintiff, Ironbound Intermodal Industries (“Ironbound”), a New Jersey corporation located in Newark, challenges the Sales and Use Tax, N.J.S.A. 54:32B-1 et seq., (“SUT”), assessments of defendant, Director, Division of Taxation (“Director”), regarding the business activities of Ironbound. These business activities include the storage of intermodal containers and chassis, as well as maintenance and repair for containers and chassis used in the shipping industry. The containers are used in the import and export of cargo coming in and going out of Port Newark and are designed to carry cargo on both land and sea.
*350 For the reasons set forth below, the court grants Ironbound’s motion for summary judgment and denies the Director’s cross-motion for summary judgment. The court finds that the statutory exemption in N.J.S.A. 54:32B-8.12 applies to Ironbound’s storage services and labor fees charged for chassis repairs because Iron-bound’s facilities constitute marine terminal facilities for purposes of the statute.
I. STATEMENT OF FACTS AND PROCEDURAL HISTORY
This opinion sets forth the court’s findings of fact and conclusions of law on the parties’ cross-motions for summary judgment. R. 1:7-4. The court’s findings of fact are based on the certifications and exhibits submitted by the parties, including a video presentation of Ironbound’s facilities, as well as the parties’ oral argument on the motions. Both parties agree that the material relevant facts are undisputed and that the controversy lies within the interpretation of the exemption statutes.
Since 1995, Ironbound has provided storage, maintenance and repair services with respect to intermodal containers and chassis to the shipping industry at Port Newark.[1] As part of its services, Ironbound also stores and repairs both non-temperature-controlled containers and “reefers,” the refrigerated intermodal containers used in the transportation of frozen or chilled goods.
The containers at issue are custom-designed to be stacked on container ships and to withstand the stresses of sea voyage. The containers are the means for efficiently loading and unloading cargo from and to vessels, while also providing complete protection for the cargo from damage and pilferage. Once a container of import cargo is off-loaded from a vessel, it will usually be placed in a storage yard until it is ready for the inland delivery of its cargo. Admiralty law treats the maritime container as an integral component of the vessel because it is essential to the handling of the vessel’s cargo.
*351 When a container is ready for inland delivery, it is physically lifted on to, and married to via locking devices, a chassis. A truck pulls the integrated unit to its inland destination from the terminal. The married container and chassis perform the same function as the trailer in a semi-tractor-trailer unit. After the import cargo is delivered, the empty container and chassis unit is almost always delivered back to the marine terminal.
Once back at the marine terminal, the empty container is disconnected from the chassis and again grounded. The container will either be married to a chassis again for re-dispatch inland to pick up an export load or it will be placed aboard an outbound vessel. The vessel sails for overseas destinations and the process will be repeated at the overseas port.
As instruments of international trade, intermodal freight containers are highly regulated both globally and nationally to assure the safe carriage of internationally shipped cargo.
Due to an imbalance in international trade, as well as the cost efficiency of having ships fully loaded when set to sail, more import containers come in than go out. The temporary storage of both loaded and emptied containers is an indispensable and integral part of the operation of New Jersey’s shipping industry, allowing it to be competitive with other ports outside of New Jersey. Facilities such as Ironbound’s have allowed the Port Newark marine terminals to maximize the use of their available space for the loading and unloading of cargo on and off the ships by transferring other services like storage and repairs to convenient facilities located nearby.
During the relevant time periods, off-site container depots handled 36% of Port Newark’s container inventory in storage and 14% of Port Newark’s truck gate moves. Ironbound and similar operations generated 28% of Port Newark’s container equipment maintenance and repair labor hours.
Ironbound’s three facilities do not contain piers or wharves and are not capable of “stevedoring,” the process of loading and unloading containers on and off vessels. The facilities are located between four tenths of a mile and three miles from Port Newark. *352 Though not part of Port Newark, Ironbound is located in the Port District,[2] an area that serves as the defining geographic scope of the Port Authority of New York and New Jersey. In all other respects, Ironbound serves the same industry and provides the same services as the marine terminals located within Port Newark. Ironbound supplements the services of Port Newark marine terminals by providing necessary and convenient storage, repair and maintenance services and has contributed to the expansion of the import/export industry in New Jersey.
Like the businesses located within Port Newark, Ironbound interfaces with ocean carriers, trackers, leasing companies, rails and the marine terminal via up-to-date computer tracking and booking systems. Ironbound’s mechanics belong to the same union as workers located physically at the marine terminals. Ironbound’s container storage customers are ocean carriers, terminal operators and container equipment leasing companies. The predominant service provided by Ironbound to ocean carriers and terminal operators is the short-term storage of empty containers awaiting dispatch to pick up export loads.
For the convenience of its customers, Ironbound also provides maintenance and repair of chassis used to transport the containers on land. With respect to chassis maintenance and repair, Iron-bound’s services include the types of repairs necessary to place the chassis in a condition that meets federal and state inspection requirements and keeps the chassis moving to their destination. Ironbound does not perform major repairs, such as repairing a bent frame.
Businesses located within Port Newark that perform the same services as Ironbound are exempt from the taxes in question. Ironbound is deemed by the Director to not qualify for the exemption due to the locations of its facilities and their lack of stevedoring.
*353 On December 8, 2008, Ironbound filed a complaint with the Tax Court contesting the Division of Taxation’s assessments for two separate audit periods: (1) October 1, 1999 through September 30, 2003 and (2) January 1, 2004 through December 31, 2007. The Pinal Determination upholding the assessment for the first audit period was issued October 2, 2008. The Notice of Assessment for the second audit period was issued October 27, 2008. All interest that has continued to accrue on the above-assessed SUT liability is in dispute.
It is undisputed that, during the periods at issue for each audit, Ironbound provided international maritime intermodal container storage services with respect to containers that were used in the loading, unloading and handling of cargo at piers, wharves, docks, and similar facilities. Additionally, Ironbound provided chassis repair services with respect to chassis that were used to transport international maritime intermodal containers. The chassis were used at piers, wharves, docks, and similar locations in loading, uploading and handling cargo by commercial ships.
Ironbound filed a motion for summary judgment seeking a determination that its container storage services, chassis repair services and chassis repair and replacement parts provided at its facilities are exempt from SUT based upon exemptions found in N.J.S.A 54:32B-8.12, 54:32B-8.41 and 54:32B-8.43. Specifically, Ironbound asserts that its operations are integral, necessary and convenient to the loading, unloading and handling of cargo at a marine terminal facility.
The Director cross-moves for summary judgment and requests that the court uphold its assessments of sales tax on Ironbound’s storage services and chassis repair services. The Director denies the SUT exemptions, concluding that Ironbound does not meet the definition of a “marine terminal facility” as intended by the exemption statute because Ironbound conducts its services and operations off-site of Port Newark. The Director also claims that Ironbound must pay tax amnesty penalties associated with any taxes due and requests late and underpayment penalties because Ironbound lacked good cause in its failure to pay the taxes at the *354 time they were due. The Director admits that the repair and replacement parts utilized in the repair of chassis are exempt from taxation under N.J.S.A 54:32B-8.43 and will credit Ironbound for sales tax improperly collected from its customers.
II. LEGAL ANALYSIS
A. Summary Judgment
Summary judgment is appropriate when:
[Tjhe pleadings, depositions, answers to interrogatoiies and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.
[ft 4:46-2(c).]
Summary judgment is proper if “a discriminating search of the merits in the pleadings, depositions and admissions on file, together with the affidavits submitted on the motion clearly shows not to present any genuine issue of material fact requiring disposition at a trial.” Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 75, 110 A.2d 24 (1954) (citation removed).
Our Supreme Court has emphasized the importance of summary judgment “not only to save antagonists the expense of protracted litigation but also to reserve judicial manpower and facilities to cases which meritoriously command attention.” Brill v. Guardian Life Insurance Co. of America 142 N.J. 520, 542, 666 A.2d 146 (1995) (quoting Robbins v. Jersey City, 23 N.J. 229, 240-241, 128 A.2d 673 (1957)).
Both parties have conducted extensive discovery and have stipulated to the relevant facts. The parties move as a matter of law for summary judgment in their favor and the court upon considering the moving papers, the video presentation and oral argument concludes that there are no material facts in dispute and the matter is appropriately resolved through summary judgment.
B. Exemption Statute N.J.S.A. 54:323-8.12
Ironbound argues that its container storage services and chassis repair labor charges are exempt from taxation under *355 N.J.S.A. 54:32B-8.12, which controls the exemption of marine terminal services and certain vessels from SUT. N.J.S.A 54:32B-8.12 provides as follows:
Receipts from sales or charges for repairs, alterations or conversion of commercial ships or any component thereof including cargo containers of any type whatsoever, barges and other vessels of 50-ton burden or over, primarily engaged in interstate or foreign commerce, machinery, apparatus and equipment for use at a marine terminal facility in loading, unloading and handling cargo carried by those commercial ships, barges and other vessels, and storage and other services rendered with respect to such loading, unloading and handling cargo at a marine terminal facility, ferryboats that are primarily engaged in the transportation of passengers during peak hours of commutation, or other vessels, regardless of tonnage, primarily engaged in commercial fishing or shell fishing, including equipment necessary for harvesting fish, shellfish and other crustaceans and aquatic organisms, or other vessels primarily engaged in commercial party boat (head boat) sport fishing and subject to annual inspection by the United States Coast Guard, and of governmentally-owned ships, barges and other vessels and property used by or purchased for the use of such vessels, machinery, apparatus and equipment for fuel, provisions, supplies, maintenance and repairs (other than articles purchased for the original equipping of a new ship) are exempt from the tax imposed under the Sales and Use Tax Act.
The plain language of the statute indicates that the exemption applies to certain specified activities conducted at a marine terminal facility. The first issue then is whether Ironbound’s facilities constitute marine terminal facilities as intended by the statute.
The Director argues that Ironbound’s facilities are not marine terminal facilities because Ironbound does not conduct stevedoring operations and its facilities are located outside of Port Newark property. Ironbound disagrees and argues that its facilities are marine terminal facilities for purposes of N.J.S.A. 54:32B-8.12. “Marine terminal” is not defined within the SUT statutes.
Review of the Director’s assessments against Ironbound must be made in light of the presumptive validity of the Director’s determinations under the Act. Quest Diagnostics, Inc. v. Dir., Div. of Taxation, 21 N.J.Tax 484, 490 (Tax 2004), aff'd, 387 N.J.Super. 104, 903 A.2d 442, certif. denied, 188 N.J. 577, 911 A.2d 69 (2006). Our courts “have recognized the Director’s expertise in the highly specialized and technical area of taxation” and thus the Director’s construction of a tax statute, “which is not plainly unreasonable and with which the Legislature has not interfered, is entitled to *356 prevail.” Aetna Burglar & Fire Alarm Co. v. Dir., Div. of Taxation, 16 N.J.Tax 584, 589 (Tax 1997).
The Director correctly points out that the plain language and structure of SUT is generally designed as an “Act of inclusion.” Fedders Fin. Corp. v. Dir., Div. of Taxation, 96 N.J. 376, 386, 476 A.2d 741 (1983) (when a taxpayer claims an exemption from a taxing statute, “the probable legislative intent is one of inclusion and exemptions are to be construed narrowly.”).
Statutory exemptions from SUT are a matter of legislative grace and are to be narrowly construed. Metpath, Inc. v. Dir., Div. of Taxation, 96 N.J. 147, 152, 474 A.2d 1065 (1984). Where a taxpayer seeks the benefit of a tax exemption, the taxpayer bears the burden of proving that it meets the elements of the exemption. Atl. City Transp. Co. v. Dir., Div. of Taxation, 12 N.J. 130, 146, 95 A.2d 895 (1953). “Statutes granting exemption from taxation ‘are most strong construed against those claiming exemption.’” Mal Brothers Contracting Co. v. Dir., Div. of Taxation, 124 N.J.Super. 55, 61, 304 A.2d 750 (App.Div.), certif. denied, 63 N.J. 554, 310 A.2d 469 (1973).
The justification underlying this strict construction is that an “exemption from taxation is a departure from the equitable principle that everyone should bear his just and equal share of the public tax burden.” Phelps Dodge Indus., Inc. v. Dir., Div. of Taxation, 8 N.J.Tax 354, 358 (Tax 1986). The rule of strict construction “means that the exemption is not to be extended beyond the ascertainable legislative intention.” Millington Quarry, Inc. v. Dir., Div. of Taxation, 5 N.J.Tax 144, 148 (Tax 1983) (citing Deubel v. Kervick, 33 N.J. 568, 574, 166 A.2d 561 (1960)).
The SUT statutes impose sales tax on the receipts from certain retail sales of tangible personal property, services and event admissions sold in this State, unless specifically exempted within the statute. N.J.S.A 54:32B-12(b) provides that all receipts for property or services of the type mentioned in N.J.S.A. 54:32B-3(a)(b)(c) and (f) are presumed subject to tax under the Act unless the contrary is established. The burden of proving the non *357 taxable or exempt status of any transaction rests upon the person required to collect the tax. N.J.S.A. 54:32B-12(b).
Because the Legislature did not include a definition for the term “marine terminal facility” within the SUT statutes, the exemption provided by N.J.S.A. 54:32B-8.12 is not facially clear and unambiguous. “If the text ... is susceptible to different interpretations, the court considers extrinsic factors, such as the statute’s purpose, legislative history, and statutory context to ascertain the legislature’s intent.” Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 323, 744 A.2d 175 (2000) (quoting Township of Pennsauken v. Schad, 160 N.J. 156, 170, 733 A.2d 1159 (1999)). Most importantly, the court will “seek to effectuate the ‘fundamental purposes for which the legislation was enacted.’ ” Township of Pennsauken, supra, 160 N.J. at 156, 733 A.2d 1159 (quoting New Jersey Builders, Owners and Managers Ass’n v. Blair, 60 N.J. 330, 288 A.2d 855 (1972)).
In 1980, the Legislature expanded SUT to exempt “the sale, repair, alterations or conversion of any component part of commercial ships, including cargo containers.” Senate Revenue, Finance and Appropriations Committee, Statement to Assembly No. 1055 (Jan. 18, 1979). Upon signing the bill into law, the Governor stated that “[a] similar exemption exists in New York law, which has left New Jersey without its fair share of this work. This bill will allow more cargo container owners to come to New Jersey for their repairs and maintenance.” Office of the Governor, Statement to Assembly No. 1055 (Jan. 14, 1980).
Additional amendments were made to the exemption in 1988, which by that time had been renumbered to N.J.S.A. 54:32B-8.12. The statute was expanded by L. 1988, c. 53 to include “machinery, apparatus and equipment for use at a marine terminal facility in loading, unloading and handling cargo carried by those commercial ships, barges and other vessels, and storage and other services rendered with respect to such loading, unloading and handling cargo at a marine terminal facility” and “machinery, apparatus and equipment” within its exemption.
*358 The statement accompanying L. 1988, c. 53 explains that the bill “creates a sales and use tax exemption for storage and other services rendered at a marine terminal facility with respect to loading, unloading and handling of cargo carried by commercial vessels ... [and] for machinery, apparatus and equipment used at a marine terminal facility in loading, unloading and handling cargo carried by commercial vessels.” Assembly Appropriations Committee, Statement to Senate No. 1019 (May 23, 1988).
The court’s “overriding objective in determining the meaning of a statute is to ‘effectuate the legislative intent in light of the language used and the objects sought to be achieved.’” McCann v. Clerk of Jersey City, 167 N.J. 311, 320, 771 A.2d 1123 (2001) (quoting State v. Hoffman, 149 N.J. 564, 578, 695 A.2d 236 (1997)). Although a marine terminal facility is not defined in the SUT statutes, the clear* purpose of N.J.S.A. 54:32B-8.12 was to promote expansion of the shipping industry in New Jersey and to allow New Jersey to compete with ports located in nearby states, particularly those that already had a sales tax exemption in place.
While not defined within the SUT statutes, the Legislature has defined the term “marine terminal” in other statutes that predate the most recent amendment of N.J.S.A. 54:32B-8.12. In 1931, the Legislature defined “marine terminal” in the context of municipal waterfront improvements in N.J.S.A 40:68-18, which states as follows:
As used in this article the words “marine terminal” means and includes a development consisting of one or more piers, wharves, docks, bulkheads, slips, basins, vehicular roadways, railroad connections, side tracks, sidings and other buildings, structures, facilities or improvements, necessary or convenient to the accommodation of steamships or other vessels and their cargoes and passengers.
The Legislature used similar language, including “necessary or convenient,” when defining marine terminals in N.J.S.A 12:11A-3 (South Jersey Port Corporation) and N.J.S.A. 32:1-35.30 (Port Authority of New York and New Jersey Compact of April 30, 1921).
The Director points to the two definitions of “marine terminal” contained within N.J.S.A 32:1-1, et. seq., the statutory authority for the compact between New York and New Jersey that created *359 and governs the Port Authority of New York and New Jersey, and argues that the definitions must be read together. As stated above, the definition of marine terminal within the Port Authority Compact, N.J.S.A 32:1-35.30, contains similar language to N.J.S.A. 40:68-18, but it is expanded to include highways, railroad freight projects, etc.[3] N.J.S.A 32:1-154.18(1) provides a definition of marine terminal specifically for the rules and regulations of the Port Authority’s governing of traffic on highways in air terminals and marine terminals.[4] This definition naturally pertains to developments operated by the Port Authority. The Director argues that when read together, these definitions require a facility to be capable of stevedoring and/or must be operated by the Port Authority in order to qualify as a marine terminal facility. The court disagrees.
In City of Newark v. Essex County Board of Taxation, our Supreme Court explored the meaning of the terms “marine termi *360 nal” and “marine terminal purposes” in the context of property tax exemptions specific to Port Authority property. 54 N.J. 171, 254 A.2d 513 (1969). The decision gives a detailed history of the development of Port Newark and the ultimate acquisition of certain real property by the Port Authority of New York and New Jersey.[5] Id. at 173-183, 254 A.2d 513. The Court found that the term “marine terminal” was intended by the Legislature to have a broad and expansive definition, as evident in the following passage:
As has already been pointed out, the 1921 compact sweepingly defined terminal facilities to include “warehouses” and all kinds of terminal or storage facilities then used or thereafter designed for the “handling, storage, loading or unloading of freight” at steamship terminals. The 1947 compact, explicitly executed to enable the rehabilitation and expanded operation of the Port Newark terminal complex which then contained warehousing, processing and distribution facilities, embodied definitions of “marine terminals” and “marine terminal purposes” which were broad and flexible rather than narrow and fixed and are to be liberally construed.
[Id. at 192, 254 A.2d 513 (citations removed).]
This court finds that Ironbound’s three locations in Newark meet the definition of a marine terminal provided by N.J.S.A. 40:68-18, as each facility is a development consisting of structures, facilities and improvements necessary or convenient to the accommodation of steamships or other vessels and their cargoes. The definition of marine terminal is general and broad in nature and not limited to Port Authority jurisdiction or location. Because this court finds that Ironbound’s facilities constitute marine terminal facilities, Ironbound’s container storage services and chassis repair labor charges are exempt from taxation under N.J.S.A. 54:32B-8.12
As the court finds that Ironbound’s facilities constitute marine terminal facilities for purposes of N.J.S.A 54:32B-8.12, there is no need to analyze the parties’ alternative arguments.
III. CONCLUSION
The court finds that Ironbound is a marine terminal facility as intended by the Legislature. Ironbound’s container storage ser *361 vices and chassis repair services provided at its three Newark facilities are exempt from the Sales and Use Tax, N.J.S.A. 54:32B-1 et seq., based upon the exemptions in N.J.S.A. 54:32B-8.12. Ironbound’s storage services and chassis repair services are necessary and convenient to the loading, unloading and handling of cargo at Port Newark and support the legislative purpose of the exemption, namely to assist in the expansion of the shipping industry in New Jersey and to remain competitive with nearby states.

 Port Newark is located on Newark Bay and is run by the Port Authority of New York and New Jersey.

 The Port District is a bi-state region generally considered to be the area within a 25-mile radius of the Statue of Liberty, which encompasses seventeen counties of New York and New Jersey.

 N.J.S.A. 32:1-35.30 provides: " 'Marine terminals’ shall mean developments, consisting of one or more piers, wharves, docks, bulkheads, slips, basins, vehicular roadways, railroad connections, side tracks, sidings or other buildings, structures, facilities or improvements, necessary or convenient to the accommodation of steamships or other vessels and their cargoes or passengers and shall also mean waterfront development projects. It shall also include such highway projects in the vicinity of a marine terminal providing improved access to such marine terminal as shall be designated in legislation adopted by the two states. Notwithstanding any contrary provision of law, it shall also mean railroad freight projects related or of benefit to a marine terminal or which are necessary, convenient or desirable in the opinion of the port authority for the protection or promotion of the commerce of the port district, consisting of railroad freight transportation facilities or railroad freight terminal facilities, and any equipment, improvement, structure or facility or any land, and any building, structure, facility or other improvement thereon, or any combination thereof, and all real and personal property in connection therewith or incidental thereto, deemed necessary or desirable in the opinion of the port authority, whether or not now in existence or under construction, for the undertaking of railroad freight projects.”

 N.J.S.A. 32:1-154.18(1) provides: ’"Marine terminals’ shall mean developments operated by the Port Authority consisting of one or more piers, wharves, docks, bulkheads, slips, basins, vehicular roadways, railroad connections, side tracks, sidings or other buildings, structures, facilities or improvements, necessary or convenient to the accommodation of steamships or other vessels and their cargoes or passengers."

 Then known as "Port Authority of New York.”