EVERS, J. T. C.
The issues involved in this matter are voluminous but all stem from the claim of Mahwah Township (herein Mahwah) for a rebate pursuant to N.J.S.A. 54:4-5 (herein rebate statute) of a portion of funds paid by Mahwah to Bergen County (herein county) toward the annual county budget from 1972 through 1980 in the approximate amount of $4,750,000. A resolution of this claim requires a determination of the standards which must be satisfied by the claimant in order for it to successfully pursue its claim, as well as a finding as to whether such standards were satisfied. Mahwah also pleaded, in the alternative, that the state-owned Ramapo College and the county-owned Police and Fire Academies, both of which are located in Mahwah, and on which it bases its rebate claim, should be removed from the exempt property list if the court finds that Mahwah is not entitled to a rebate. This alternative argument was made only with respect to 1978, 1979 and 1980. Mahwah’s claims to the Bergen County Board of Taxation for a rebate were denied. Various Bergen County municipalities defended against the claim because if Mahwah was successful each Bergen County *520 municipality’s share of the total county tax contribution would be proportionately increased.[1]
The constitutionality of the rebate statute was challenged, and therefore the municipality of Cedar Grove in Essex County was permitted to participate as amicus curiae in order for it to argue in support of the constitutionality of the rebate statute. Cedar Grove is the only municipality currently receiving a rebate pursuant to N.J.S.A. 54:4-5. The basis for permitting participation is apparent.
From this beginning the matter developed into a controversy implicating profound issues beyond the realm of local property tax law. In addition to the attack on the constitutionality of the rebate statute which was brought by defendants, the constitutionality of a supplement thereto was challenged by Mahwah. The latter’s position was supported by Cedar Grove.[2] Additionally, defendants moved to strike any testimony pertaining to any facilities other than hospitals and for the dismissal of Mahwah’s rebate claims for 1978, 1979 and 1980 on the basis that the latter’s receipt of payments in lieu of taxation pursuant to N.J.S.A. 54:4-2.2a et seq. prohibits Mahwah from obtaining a double benefit.[3]
The rebate statute, N.J.S.A. 54:4-5, states:
A taxing district in a county of the first class having in excess of 800,000 population in which there has been located a state or county institution other than a park commission occupying more than 200 acres and not in excess of 400 acres of land, in the aggregate, shall have remitted or rebated by the county *521 treasurer a sum equal to one-half of the county tax rate applied to the entire amount of ratables remaining subject to taxation. A taxing district in such a county of the first class in which there has been located a state or county institution other than a park commission or lands owned or occupied by a park commission occupying in excess of 400 acres of land, in the aggregate, shall have remitted or rebated by the county treasurer a sum equal to three-quarters of the county tax rate applied to the entire amount of ratables remaining subject to taxation.
As previously noted this provision was supplemented by Senate Bill 1265 L.1980, c. 118, which states:
No taxing district which has not actually received a remission or a rebate of county taxes pursuant to R.S. 54:4-5 for any full tax year occurring prior to the effective date of this act, shall receive a remission or rebate under that section for the current tax year or any other tax year whether occurring prior to or after the effective date of this act. Nothing contained in this act shall affect any remission or rebate of county taxes to be received pursuant to that section by any taxing district which actually received a remission or rebate for a full tax year occurring prior to the effective date of this act.
Prior to trial the court entertained defendant’s motions for dismissal of Mahwah’s complaints on the basis of untimely filing and challenging the constitutionality of the rebate statute.
Defendants, specifically the county board of taxation through the Attorney General, contended that such claims should have been made within 30 days following the county board’s adoption of the Table of Aggregates.[4] Clearly the claims were not filed within that period. Defendants reasoned that since a successful Mahwah claim would result in increased contributions to the county by each municipality, which shares must be reflected in the Table of Aggregates, the filing period for a rebate claim commenced to run from the date of promulgation of the Table which failed to recognize Mahwah’s claim.
In a letter opinion this court granted defendant’s motion for dismissal for the years 1972 and 1973 based on Mahwah’s late filing of its complaints. Judgments were entered accordingly. Defendant’s motions for the succeeding years were denied.
For the years involved Mahwah petitioned the county board to approve its rebate claim. In each case, with the exception of *522 1972 and 1973, Mahwah filed the petitions prior to August 15 of the year for which the claim was filed, pursuant to N.J.S.A. 54:3-21 under which the vast majority of appeals to the county boards are filed. In every case the county board conducted a hearing thereon and denied the petition. If at any time between 1974 and 1979 the county board denied Mahwah’s petitions on the grounds that they were untimely or filed in the wrong forum, no such reasons were ever furnished to Mahwah. To the contrary, the county board heard the arguments and (for whatever reason) thereafter acted upon the petitions by entering judgment denying the claims. Within 30 days following those actions appeals were filed with the Division of Tax Appeals (or the Tax Court) by Mahwah.[5]
Based on this factual foundation the court held that Mahwah did not have to file an appeal directly to the Division of Tax Appeals (or now the Tax Court) within 30 days from the adoption of the Table of Aggregates. This court found that the county board was estopped from repudiating its prior conduct in accepting the complaints, so that Mahwah’s filing of an appeal pursuant to N.J.S.A. 54:3-21 was justifiable.
The motion for dismissal based on the unconstitutionality of the rebate provision was briefed and taken under advisement. The law concerning the construction of statutes is replete with presumptions in favor of the constitutionality of statutes. One of the fundamental principles of judicial construction is that courts (particularly trial courts) must always avoid a constitutional issue by virtue of an alternative, independent disposition of another issue in the case. See Donadio v. Cunningham, 58 N.J. 309, 277 A.2d 375 (1971); Matter of R. B., 158 N.J.Super. 542, 386 A.2d 893 (App.Div.1978); Value Oil Co. v. Irvington, 152 N.J.Super. 354, 377 A.2d 1225 (Law Div.1977), aff’d 164 N.J.Super. 419, 396 A.2d 1149 (App.Div.1978); Rybeck v. Rybeek, 141 N.J.Super. 481, 358 A.2d 828 (Law Div.1976), app. dism. 150 N.J.Super. 151, 375 A.2d 269 (App.Div.1977); Tonsorial Inc. v. *523 Union City, 115 N.J.Super. 33, 277 A.2d 909 (Law Div.1977), and Shanley v. Nuzzo, 160 N.J.Super. 436, 390 A.2d 158 (Cty.Ct.1978).
If, in fact, Mahwah does not prove the requisite elements of NJ.S.A. 54:4-5, it would then be purposeless to address the constitutional question. In short, this matter must first be scrutinized in terms of its substantive merits before the constitutional issue can be considered.
It is significant to note that the only reported Supreme Court case construing the rebate provision, Paramus v. Capello, 66 N.J. 1, 326 A.2d 685 (1974), held:
We find it unnecessary to consider and decide the issues of constitutionality, arbitrariness, and retroactivity which have substantial implications beyond the confines of this case. [At 5, 326 A.2d 685]
There the court affirmed the Division of Tax Appeals’ finding that “large sections of the 185 acre Bergen Pines complex are presently unused.” Ibid. It is obvious that even the Supreme Court avoided the constitutional issues since there was a substantial independent ground of disposition. This court would be remiss in failing to hold that the Capello case is controlling in this respect.[6]
During the course of the trial defendants urged dismissal of the complaints on the ground that the rebate act applied only to hospitals. Decision was reserved. This argument was based on defendants’ construction of NJ.S.A. 54:4-5 and N.J.S.A. 54:4-2.-2a et seq. (The State Payments in Lieu of Taxation Act). NJ.S.A. 54:4-2.2a states:
“State property” means land and improvements owned by the state and includes but shall not be limited to state offices, hospitals, institutions, schools, colleges, universities, garages, inspection stations, warehouses, barracks and armories together with abutting vacant land held for future development for the same purposes. State property shall not include that used or held for future use for highway, bridge or tunnel purposes or property which is qualified under state law for any other state payment in lieu of taxes.
*524 Defendants maintain that these provisions, coupled with the legislative intent underlying the rebate statute, demonstrate that the rebate statute applies only to hospitals.[7] Thus, defendants moved to strike any testimony pertaining to the state-owned Ramapo College facility. The argument is not well taken. Defendants failed to persuade this court that the Legislature, by enacting N.J.S.A. 54:4-2.2a et seq., implicitly buttressed the purported intention found in the rebate provision that hospitals were the only institutions coming within its ambit. When a court is asked to construe a statute on the basis of an inference or implication, the proffered construction must demonstrate that what is purportedly implied is done so in a clear fashion. Juzek v. Hackensack Water Co., 48 N.J. 302, 225 A.2d 335 (1966) and Giles v. Gassert, 23 N.J. 22, 127 A.2d 161 (1957). This principle is especially critical in matters of taxation since in construing a tax statute significance must be ascribed to clearly intelligible and declaratory words of the statute, and it must be assumed that they were used purposefully. Wilentz v. Hendrickson, 133 N.J.Eq. 447, 33 A.2d 366 (Ch.1943), aff’d 135 N.J.Eq. 244, 38 A.2d 199 (E. & A. 1944).
The rebate statute uses the phrase “state or county institution other than a park commission or lands owned or occupied by a park commission. ...” The text itself demonstrates that the Legislature had property other than hospitals in mind, in view of the reference to park commission lands. By express exclusion it revealed the class of property to be general since the exclusion for county park lands would be mere surplus-age if the Legislature intended that hospitals were the only type of property implicated by the provision.
In rebuttal to Mahwah’s argument made in opposition to this motion, defendants argued that because Mahwah was receiving payments in lieu of taxation pursuant to N.J.S.A. 54:4-2.2a et seq., they could not get the double benefit of a rebate pursuant *525 to N.J.S.A. 54:4-5. This argument actually was directed at the fact that Mahwah pleaded alternatively that if it did not qualify under the rebate statute the subject property should be deleted from the exempt rolls. Defendants argued that N.J.S.A. 54:4-2.2a et seq. was in effect a waiver of the exemption by the State.
The original provision allowing for payments in lieu of the taxation of state property, N.J.S.A. 54:4-2.1, provided in pertinent part:
All lands, except riparian lands and lands excepted by Section 54:4-2.2 of this Title, owned by or held in trust for the state, which are used or to be used for state purposes,... shall be taxed in the municipality wherein such lands are situate, for municipal and local school purposes, unless the aggregate area of such lands is less than nine percentum of the total area of the municipality after deducting from the total area of the municipality so much thereof, if any, as is exempt from taxation because it comprises state forests, state parks, riparian lands, lands held by the State Board of Proprietors or lands held for highway, bridge or tunnel purposes or exempt from taxation under the provisions of Article 1 of Chapter 8 of the Title “Conservation and Development — Parks and Reservations” (Section 13, 8-1 et seq), or Sections 54:4-5 or 54:4-6 of this Title.... There shall not be included in the assessed valuation of such lands any improvements constructed or erected by this state ....
Thus, only land owned by the State was permitted to be taxed. Significantly, N.J.S.A. 54:4-2.2 provided that 54:4-2.1 “shall in no way effect Sections 54:4-5 or 54:4-6. . .and no taxation of lands mentioned in. . . said Sections 54:4-5 or 54:4-6 shall be made under provisions of said Section 54:4-2.1.” Thus, this section preserved the independent vitality of the rebate provision by expressly harmonizing it with NJ.S.A. 54:4-2.1.
In L.1977, c. 272, § 12, NJ.S.A. 54:4-2.1 and N.J.S.A. 54:4 2.2 were repealed and NJ.S.A. 54:4 — 2.2a et seq. was enacted to replace the repealed provisions. L.1977, c. 272, § 1 et seq.[8]
NJ.S.A. 54:4 — 2.2a clearly included improvements within the meaning of “state property” that must be assessed as if the *526 “state property” was not exempt. N.J.S.A. 54:4-2.2c. N.J.S.A. 54:4-2.2e provides the statutory formula for calculating the State’s tax liability. The most significant provision for purposes of this matter is N.J.S.A. 54:4-2.2b, which states:
Notwithstanding the provisions of any other law and to compensate municipalities for the impact upon local government cost of local services to state property, such property shall be assessed and subject to an in lieu tax payment provided in this act.
The clear language of this provision indicates that the sole relief accorded to municipalities burdened with state property within its borders is payment in lieu of taxation pursuant to N.J.S.A. 54:4 — 2.2a et seq. Accordingly, defendant’s motion is granted with respect to the years 1978, 1979 and 1980 and Mahwah’s claims will accordingly be dismissed.
The effect of this determination is that, assuming arguendo that Mahwah can prove its claim as to the balance of the property (the Bergen County Police and Fire Academy, consisting of approximately 24 acres), it still cannot qualify under the rebate statute since the area of the balance of the property does not even approximate the minimum of 200 acres required by the rebate statute. Likewise, Mahwah’s claim for exemption regarding the college complex must be dismissed since the Payment in Lieu of Taxation Act already effectively removed the exemption. Its exemption claim as to the Bergen County Police and Fire Academy for the years 1978, 1979 and 1980 remains unaffected; by this holding and must be further addressed, along with Mahwah’s rebate claim for the years 1974 through and including 1977.
The evidence adduced was primarily directed toward satisfying the element of use or occupation as employed in the rebate and public property exemption statutes. The thrust of the voluminous testimony must be interpreted in light of the standard of use employed by both provisions. Thus, the key issue concerning the substantive claims of Mahwah is the question of what is the appropriate standard of use within the meaning of the rebate statute.
*527 The critical language of the rebate statute states that in order for the taxing district to qualify for the rebate, “a state or county institution.. . occupying more than 200 acres and not in excess of 400 acres of land” must be located therein. The key word, “occupying,” was construed, with respect to land adjacent to a county-owned hospital complex, in Paramus v. Capello, 66 N.J. 1, 4, 326 A.2d 685 (1974) to “mean something more than mere ownership of land and connotes actual governmental use.” In Bergen Cty. v. Paramus, 158 N.J.Super. 512, 517, 386 A.2d 878 (App.Div.1978), the court held, in a case concerning the same property as in Capello, that “the criteria of ‘occupied’ and ‘used’ respectively employed in N.J.S.A. 54:4-5 and N.J.S.A. 54:4-3.3 are identical,” since “these provisions are in pari materia.” Although the Supreme Court remanded the matter to the Division of Tax Appeals, it agreed with the Appellate Division regarding its construction of N.J.S.A. 54:4-5 and N.J.S.A. 54:4-3.3. Bergen Cty. v. Paramus, 79 N.J. 302, 309, 399 A.2d 616 (1979).
Consequently, the Supreme Court has equated the word “occupied” in N.J.S.A. 54:4-5 with the key language, “used for public purposes,” in N.J.S.A. 54:4-3.3, and opined that “the statutory language ‘used for public purposes’ clearly contemplates that something more than ownership must be established. The word ‘used’ connotes employment or application to an end.” Id. at 306, 399 A.2d 616.
It must be emphasized that both of the foregoing cases dealt with the construction of the rebate statute and/or public property statute vis-a-vis county-owned property — a significant factor to be considered herein. The language in the two cases clearly indicates that the standard of use within the meaning of the rebate statute means something more than mere ownership. But this language must be understood in terms of the public property exemption vis-a-vis county-owned property. The property herein is composed primarily of state property. The significance of this fact is that, in construing the rebate statute *528 vis-á-vis state property, the payments in lieu of taxation statute must be construed in pari materia with the public property statute and rebate statute.
Of the public property statute, the rebate statute and the payments in lieu of taxation statute, the public property statute was the first provision enacted regarding the taxation of state property. L.1866, c. 487 § 5, p. 1079, stated:
The property and the bonds and other securities of the United States, and the bonds and securities of this state, which are by law exempt from taxation, the property of the counties, townships, cities and boroughs of this state, and stocks and other personal estate owned by citizens of this state, situate and being out of this state, upon which taxes shall have been actually assessed and paid within twelve months next before the day prescribed by law for commencing the assessment.
L.1903, c. 208, § 3(2), significantly revised this provision:
The property of the United States and of the State of New Jersey and of the respective counties, school districts, and taxing districts when used for public purposes, but this exemption shall not include real property bought in for debts or on foreclosures of mortgages given to secure loans out of public funds or out of money in court, which property shall be taxed unless devoted to public uses
In L.1918, c. 236, § 203(2), the Legislature again revised this exemption:
The property of the United States and of the State of New Jersey; property of the respective counties, school districts, and taxing districts, when located therein and used for public purposes, but this exemption shall not include real property bought in for debts or on foreclosures of mortgages given to secure loans out of public funds or out of money in court, which property shall be taxed unless devoted to public uses.
The placing of a semicolon in the act in order to set off state and federal property from other public property effected a subtle yet profound change. State and federal property no longer had to be “used for public purposes” as did county, school districts and taxing district property. This subtle yet significant feature of the statute is often overlooked and yet this exemption was carried forth through the years in substantially *529 the same form and was codified as the first section of N.J.S.A. 54:4-3.3.[9]
The rebate statute had a common ancestor with the public property exemption statute since the rebate statute was also derived from L.1918, c. 236, § 203(2). The rebate statute made its first appearance in L.1922, c. 130:
1. Any taxing district in any county of the first class in this state in which there has been located any state or county institution occupying 200 acres or more of land shall have remitted or rebated by the county collector a sum equal to one-half of the county tax rate applied for the entire amount of ratables remaining subject to taxation.
2. The county board of taxation of said county shall by rule prescribe how said remission or rebate shall be paid or credited to the collector of said taxing district by the county collector and how his or her proportionate part shall be returned or credited to each taxpayer.
L.1928, c. 176, amended the rebate statute to read as follows:
1. Any taxing district in any county of the first class in this state in which there has been located any state or county institution or institutions occupying more than 200 acres and not in excess of 400 acres of land, in the aggregate, shall have remitted or rebated by the county collector a sum equal to one-half of the county tax rate applied for the entire amount of ratables remaining subject to taxation. Any taxing district in any county of the first class in this state in which there has been located any state or county institution or institutions occupying in excess of 400 acres of land, in the aggregate, shall have remitted or rebated by the county collector a sum equal to three-fourths of the county tax rate applied for the entire amount of the ratables remaining subject to taxation.
This substantial modification clearly permitted the aggregating of institutions and contained a provision addressing the taxation of institutions (or institution) occupying more than 400 acres. In L.1932, c. 128, the Legislature limited the definition of institutions to those institutions “other than park commission, or lands owned or occupied by any park commission.” In L.1952, c. 295, the Legislature added the population requirement of “in excess of 800,000” to the condition of being a first class county, while also providing for a rebate to first class counties having less than 800,000 citizens within its borders. This last proviso as to first class counties having less than 800,000 people was *530 deleted in L.1968, c. 467. The final legislative action regarding the rebate statute was L.1980, e. 118, supra. That action appeared to have preserved the rebate for those taxing districts which had “the money in hand” before the effective date of the supplement — September 22, 1980.
Of the three acts, the payments in lieu of taxation provisions were the latest to arrive on the scene of the taxation of state property. That act made its initial appearance in L.1935, c. 250. That legislative expression was essentially the same as the form of the statute before its repeal by the new Payments in Lieu of Taxation Act (L.1977, c. 272). The obvious intent of this statute was “to assist localities in which state holdings are large.” Todd Shipyards Corp. v. Weehawken, 45 N.J. 336, 343, 212 A.2d 364 (1965).
The same underlying purpose must be ascribed to the rebate statute. Paramus v. Capello, supra, 66 N.J. at 4, 326 A.2d 685. Both statutes sought to compensate taxing districts, yet they accomplished their common objective in different ways.
The rebate statute compensated taxing districts for the impact of state-owned land and improvements (other than park-lands from the years 1932 et seq.), while the Payments in Lieu of Taxation Act originally sought to compensate taxing districts only on the basis of land and not improvements. It was not until 1977 that the Payments in Lieu of Taxation Act (N.J.S.A. 54:4-2.2a et seq.) used improvements as a basis for compensation. Since its effective date the Payments in Lieu of Taxation Act in effect superseded the rebate statute where a taxing district was compensated pursuant to N.J.S.A. 54:4-2.2a et seq. See N.J.S.A. 54:4-2.2b.
Based on the foregoing analysis of this comprehensive scheme, it is quite clear that the pre-1977 Payments in Lieu of Taxation Act attempted to partially compensate taxing districts for the loss of ratables by virtue of large amounts of state-owned property (raw land). The rebate statute, since its inception, compensated taxing districts on the basis of services rendered to the improved land, i.e., institutions. See Legislative Statement *531 to L.1922, c. 130. The rebate statute was much less concerned with the loss of ratables than the old Payments in Lieu of Taxation Act. The new Payments in Lieu of Taxation Act changed the scheme profoundly since it clearly sought to compensate taxing districts on the basis of services rendered to state property land and building included.
From this analysis it is clear that the Legislature’s focus has changed with the times, and it is not possible to draw any single standard of use from the comprehensive legislative scheme. While each statute is a limited counterpart of the other, they are not, strictly speaking, identical in terms of their operative language. Yet the expansive language found in the Capello and Bergen County cases seems to suggest that the key to unraveling the rebate statute rests in the public property statute’s language, “used for public purposes,” since the criteria of “occupied” and “used” respectively employed in N.J.S.A. 54:4-5 and N.J.S.A. 54:4-3.3 are identical. Bergen Cty. v. Paramus, supra, 158 N.J.Super. at 517, 386 A.2d 878. If this language were taken literally, however, the standard found in the rebate statute (incorporated from the public property statute) vis-a-vis state property would be mere ownership, since state property need not be “used for public purposes,” according to the express terms of that statute. Such construction would create a double standard — one for state property and another for other public property in general. Moreover, such standard would allow taxing districts to qualify under the rebate statute merely on the basis of having state-owned property within its borders, notwithstanding the fact that such land might be used for a private purpose. Such a construction would fly in the face of the underlying purpose of the rebate statute and would flout its use of the word “occupied.” Consequently, this court holds that the standards set forth in the Capello and Bergen County cases shall apply likewise to state property so that such state property must be “used for public purposes,” because:
The rebate provision is a limited counterpart of the tax exemption. It is a method which the Legislature created to compensate some municipalities for revenues they would have otherwise received if the property had not been *532 exempt from taxation, a condition which arose by virtue of public ownership and use. [Bergen Cty. v. Paramus, supra, 79 N.J. at 309, 399 A.2d 616],
The court also set forth the appropriate standard for vacant land:
To interpret the word “used” to mean only actual use would be unrealistic, for a period of time will undoubtedly run between acquisition and placing the property in use. Some lead time will be involved due to the readying of the land and constructing whatever type structures may be needed. Between these extremes is what we conceive to be the legislative intent — namely, a present intent to devote the property to a public use within a reasonable length of time. [Id. at 308, 399 A.2d 616.]
The leading case construing the phrase “used for public purposes” is Newark v. Essex Cty. Bd. of Taxation, 54 N.J. 171, 254 A.2d 513 (1969). There the court incorporated the construction of the phrase “public purpose” found in Roe v. Kervick, 42 N.J. 191, 207, 199 A.2d 834 (1964), into its opinion regarding N.J.S.A. 54:4-3.3:
The concept of public purposes is a broad one. Yet broadly speaking, it connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern, dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare. [Citations omitted]
The foregoing principles and standards must be viewed in the context of the critical principle of construction which is at the heart of the public property exemption and which holds that while exemptions regarding private institutions are strictly construed, Bloomfield v. Academy of Medicine, 47 N.J. 358, 221 A.2d 15 (1966), exemptions available to political entities are liberally construed. In Hanover v. Morristown, 4 N.J.Super. 22, 66 A.2d 187 (App.Div.1949), the court held this principle to be applicable to the public property statute. See, also, Newark v. Essex Cty. Bd. of Taxation, supra, 54 N.J., at 184-185, 254 A.2d 513.
Accordingly, this court is bound to apply the foregoing standards so that the degree of use of the subject property must be measured by the institutional aims in conjunction with the actual use of the property. In short, the measure of the rebate *533 statute is the purposeful use of the subject property as it reflects the essential character of both land and building. It must again be emphasized that the actual physical occupation is not the standard.
Although these standards must apply equally to all public property, there is yet an additional factor to be considered that was not before the courts in the Capello and Bergen County cases.
For the remaining years in question herein (1974-1977) the Bergen County Police and Fire Academy enjoyed tax exempt status pursuant to the public property statute. Thus, for those years it was “used for public purposes” on account of its being county property. According to the Bergen County case, as to county land, “denial of the rebate statute unquestionably implies that the land is not exempt from taxation,” 158 N.J.Super. at 517, 386 A.2d 878. Thus, the obverse of the proposition is true that exemption from taxation unquestionably implies an allowance of the rebate as to county property. Stated differently, if county property is exempt pursuant to the public property statute, it meets the test of the rebate statute. This principle is at the heart of the litigation in the Capello and Bergen County cases but in the exemption case (Bergen County) the taxing district never honored the county exemption claim. Here Mahwah has always honored the exemption claim as to the Police and Fire Academy and the exempt status of the property is no longer in question since Mahwah only contested the exempt status of the property for the years 1978 through and including 1980. These years are no longer in issue by virtue of the impact of L.1977, e. 272 (the New Payments in Lieu of Taxation Act). See supra. Consequently this court is constrained to hold that the Bergen County Police and Fire Academy comes within the meaning of “occupied” under the rebate statute.[10]
*534 Unlike county property, an exemption of state property pursuant to the public property exemption is premised solely on ownership. Thus, a public property exemption for a state property does not necessarily imply that such property qualifies under the rebate statute, because such state property exemption does not include the element of “used for public purposes.” Therefore, the evidence concerning the college must be scrutinized.
The college complex is located in the developing community of Mahwah, which is situated in northwest Bergen County. From the evidence it is concluded that the campus contains approximately 357 acres. The sprawling country-like campus is bisected by Route 202 (Ramapo Valley Road), which runs north-south. The testimony describing the campus, its year-by-year development and the uses to which its 357 acres were devoted during each year in question was voluminous and detailed. In some areas the land was described as low and swampy; in others as high and rocky. Some of the higher rocky areas were described as precipitous. A goodly portion of the complex is wooded. Even if it were possible, in the view I take of this matter, a detailed description of every nook and cranny of the tract is purposeless. Following, therefore, is a general description of the three major areas which make up the complex.
The area to the west of Route 202, hereinafter referred to as 202-west, consists of approximately 29 acres and contains some improvements, including tennis courts, baseball field and a running track. The construction of these improvements covered the period from 1975 through 1978. Also located in this area is some student housing which earlier served as the residence of the college president when the land was acquired in 1971. Also located thereon is a sewage treatment plant which was constructed in 1971. The unimproved sections of 202-west contain a utility easement, the Ramapo River and alternately wooded and cleared lands. The northernmost portion of'202-west is vacant land and is located in the flood plain of the Ramapo River. In general, 202-west was described as wooded and open, but mostly *535 wooded during the period in question — a description which reinforces the rural character of the campus.
The 328 acres east of Route 202 are comprised of the college proper (hereafter referred to as the core area) and a large unbroken wooded area which, in some places, contains severe grades and actually serves as the eastern border of the complex (hereafter called the eastern perimeter). A general description of each area follows.
The main entrance to the campus is on the eastern side of Route 202 across from that part of 202-west on which is found the tennis courts, baseball field and track. The main entrance road, which runs east-west, connects directly with the center of the core area which contains the vast majority of the college buildings. Located therein are a variety of buildings which are devoted to uses commonly associated with a college and with campus living. In addition to administrative, dormitory, physical education, library and classroom buildings, the core contains various parking areas, maintenance buildings, storage sheds, center for the handicapped, alternate energy center, greenhouse, student-life building and various and sundry structures. On the fringes of the core area are located various athletic fields devoted to football, soccer and the like. Interspersed throughout the core area are wooded sections, grassy areas, ponds and streams of varying sizes. All sections of the core area are connected with a network of primary and secondary roads and paths which vary in width and in quality.
The improvements in the core area were constructed over a period of years, commencing in about 1971 to the present. Planned future development depends in large measure on the availability of government funds. From its relatively small beginning the college proper (core area) has constantly expanded in size to a point where, at present, it can best be described as substantial. Befitting its rural character, the various buildings and other improvements portray an uncrowded picture and, in most instances, are separated by wooded and landscaped areas. During the period in question the core area contained an aver *536 age of approximately 165 acres, leaving a balance of approximately 173 acres in the perimeter area.
Approximately 66 acres of the perimeter area are included in a right-of-way in favor of the State of New Jersey, to be used ostensibly for the construction of the unfinished northwest portion of Route I — 287.[11] The entire perimeter area actually serves as the eastern border of the campus. It varies in depth and, as to its almost unbroken wooded areas, in density.
It was the use of the perimeter area and particularly its northern and southern sections that were primarily disputed by defendants. Also disputed were the uses to which selected wooded and other limited areas in the core and 202-west sections were devoted.
Through the testimony of their own witnesses defendants conceded that a substantial portion of the complex was “used” within the meaning of the rebate statute in various amounts for each year. For 1974 — 1975 defendants allowed that between 116.68 and 121.82 acres were used. In 1976 — 1977 they concede that between 144.74 and 150.79 acres were used. The somewhat substantial difference between the 1974-1975 and 1976-1977 periods is accounted for by defendants’ insistence that during the earlier period 202-west was not used in any sense of the word.
The court accepts the lower acreage figures in each year as an admission of the use of the subject property. I find that the use of that acreage was fully supported by the proofs. It being Mahwah’s burden to prove that at least 200 acres were used, it first argued that the entire complex qualified and, alternatively, that even if most of the perimeter area was considered unused, the rebate statute’s test was still satisfied.
*537 In order to place the factual dispute in focus, an awareness of some background information concerning this educational complex is necessary. The college was established by the State Legislature in 1968 in response to the pressing need to improve and expand higher educational facilities in the State. In November 1968 a bond issue was approved by the voters for that purpose in the amount of $15,000,000. Except that the enabling act specified Bergen County as its home, the exact location of the new college was undetermined at that time. A board of trustees, appointed by a new State Board of Higher Education, was organized in February 1969. The first president was appointed in June 1969; a temporary office opened in Hackensack in September and shortly thereafter additional staff was appointed to undertake a detailed study of the proposed college program and the actual establishment of facilities. After reviewing approximately 30 possible locations, the 357-acre Mahwah site was selected. The temporary designation of State College of New Jersey was discarded and Ramapo College of New Jersey was born.
Its beginnings were small. Ground was broken for the first new classroom building in November 1970. It was completed in September 1971 and approximately 1,200 students were enrolled. Science laboratories and student housing were nonexistent, but these needs were filled through rented space from a nearby army facility for use as laboratories and through prevailing on a nearby Boy Scout camp, a seminary, faculty members and community residents, to provide housing. At the same time the academic program was under development. The college’s determination to feature interdisciplinary studies led to a decentralized structure of several small units of faculty and students into separate schools. The college was certified by the Middle States Association of Colleges and Secondary Schools in December 1973. From its 1971 enrollment of 1,200 students the population grew to approximately 4,000 students by 1974. Approximately 30-40 courses utilized the natural facilities of the college.
The testimony clearly demonstrated that Ramapo College is a unique educational institution in that the character and design, *538 in terms of both the lay of the land and style and location of buildings, reflects its bucolic nature. The record is replete with testimony indicating that in developing the campus and constructing its buildings there was no simple bulldozing of the land or haphazard erection of structures. Clearly, attempts were made to create a learning environment consonant with the physical environment of the campus and its surrounding area. Consequently, in terms of “using” the college lands, the aggregate of the curricular and extracurricular activities must be considered in terms of the integrated personality of the property-
Eight faculty members from the departments of geology, ecology and physical education testified that, at one time or another, and for all years in question, virtually the entire complex was utilized in some manner. Many exhibits were utilized by these witnesses on which they traced the course of such activities as cross-country, orienteering courses and the areas of such activities. Detailed testimony was given with respect to the nature of the subjects, the use of the outdoors in connection therewith, the frequency with which they were taught and the number of students in attendance. In addition to the outdoor classroom courses, the witnesses testified that courses in “teaching in the outdoors,” archery, golf, attitudes toward the outdoors, snowshoeing, skiing and the like, utilized the wooded and lawned areas of the campus. Furthermore, according to the testimony, these areas were often used by students in their free time for private uses such as jogging, walking, picnicking, sunbathing, frisbee contests and the like.
While the use of these areas for outdoor athletic and private activities was readily understandable, of great interest was the testimony of the ecology and geology faculty members. Involved in these courses were detailed studies of all growth, of rocks and minerals, of the Ramapo Fault which bisects the complex and of the organic matter found in the streams, ponds, river and flood plain. Throughout the testimony the importance of having such natural facilities “on campus” as opposed to “off *539 campus” in terms of time, expense and convenience was stressed.
Objections were taken by defendants to that testimony which was purportedly supported by tracings and areas of use placed on the exhibits. These objections were premised on the mistaken theory that physical trespass and/or intensive land use was the standard inherent in the rebate statute. The evidentiary value of this testimony lies not in its terms of precision but in determining general areas and frequency of use. To that end I find the composite picture drawn from this testimony to be very persuasive in establishing actual, albeit noncontinuous, use of the property.
In summary, it is clear that as to each year in question this testimony in the aggregate demonstrated, by a fair preponderance, that virtually the entire complex was used, within the meaning of the rebate statute. The court fully acknowledges that it is equally as clear that every square foot of the complex has not been trod upon yet the quilt of activities established by these witnesses clearly demonstrates that the complex was utilized to a great extent. The record fully supports the recognition that the curricular and extracurricular activities rose to that level of use which warrants the relief accorded to taxing districts under the rebate statute.
While it cannot be stated that the entire 357-acre complex was physically trespassed, I do find that virtually the entire tract was used within the meaning of the rebate statute. Nonetheless, because of the magnitude of this matter and the public importance therein I will make specific findings in order to avoid any conceivable ambiguity or confusion.
Such findings commence with the minimum amount of acreage conceded to be used in accordance with the rebate statute by the defendants: 116.68 acres in 1974-1975 and 144.74 acres in 1976-1977. As for the years 1974 and 1975, I find that the western portion of the complex (approximately 29 acres) should be included despite defendants’ contention that such area was not used in any sense of the word before 1976. This finding *540 is based on the testimony of Professor Drew, who testified that her geology classes used the flood plain area and the area north of said area for field work purposes for the years 1973 and following. Her coordinates were placed on the survey map with specific reference to natural monuments and features of the land, so that I accord great weight to the accuracy of her testimony as it concerns both specific and general areas of activity.
This finding also has support in the testimony of a physical education professor who testified that this western portion was used in the spring and fall of 1974 and 1975 for physical conditioning courses. He further testified that for the same time period his orienteering course used a more expansive area in this location. Because of the nature of this rather unusual activity it was clear to the court that it was necessary to conduct it in an expansive area so that precision, in terms of the square footage, was rendered somewhat inconsequential.
Moreover, I find that since construction of the athletic facility located therein commenced in March 1976, a reasonable amount of lead time for planning and development must be taken into consideration. “Present intent to devote the property to a public use” is a valid, relevant consideration under the rebate statute. Bergen County, supra, 79 N.J. at 308, 399 A.2d 616. This manifestation of present intent was corroborated by part of the college master plan that was introduced into evidence. The plan, composed in 1974, clearly contemplated the use of this area for athletic facilities.
Based on the foregoing it is evident that the entire question turns on the use (or nonuse) of the contested selected sections in the core area and of the perimeter area in its entirety.
I find that an area containing approximately 26 areas, located on Route 202 east and north of the main entrance, was used within the meaning of the rebate statute. It was uncontroverted that this area was used for sundry recreational activities for the period in question. It was also used somewhat intensively for geologic studies, according to the testimony of *541 the geology and ecology professors. Other testimony indicated a small area adjacent to the northern side of the main drive was used occasionally for physical education purposes. It was also testified that the area adjacent to the northern side of the main drive was used for golf ball driving. In 1974 there was taught “teaching in the outdoors,” a course that caused the students to traverse this area. In short, the evidence demonstrated by a fair preponderance that this area was used as an integral part of the complex in terms of purely academic as well as recreational activity. An argument can be made that such use was merely sporadic, but I find that sufficient evidence was adduced to demonstrate that the level of activity was sufficient in terms of quantity and quality to qualify under the rebate statute.
Defendants also argue that certain wooded areas located in the vicinity of the physical education, library and maintenance buildings, all of which were more or less located within the core of the core area, were nothing more than mere groves of trees and should not be considered as “used.” These various areas totalled 4.6 acres.
I find that this pruning technique is not reasonable in light of the applicable standard of use and the facts of this case. At various points in the record there was solid testimony demonstrating the concern for the “green image” of the complex. Furthermore, there was specific testimony by the Director of Campus Planning indicating the implementation of such design. For instance, he stated that the student housing located southeast of the library had no air-conditioning, so that the surrounding grove of trees would be used for purposes of protecting it from the heat in the summer and the cold in the winter. He expressly stated energy and resource conservation to be a grave concern of the institution. Moreover, such areas were reasonably appurtenant to the structures themselves.
Yet to be considered is the entire eastern border area of the 173 acres that includes the approximate 66 acres of the right-of-way in favor of the State of New Jersey. As to the southern and northern portions of the perimeter land, which *542 consisted of approximately 63 acres, I find the use of said areas does not rise to the level of activity called for under the rebate statute. This finding is based on the paucity of evidence showing nothing more than an occasional venture into these outlying areas. It can be argued that this paucity of testimony was equivalent to that which was the basis of finding other areas used within the meaning of the rebate statute. A careful analysis of the record demonstrates that the testimony as to these areas was vague and ambiguous at best. This malady was not shared by the other testimony regarding the property found to be used within the meaning of the rebate statute.
The only remaining problem area was the 66-acre right-of-way in favor of the State of New Jersey for purposes of building 1 — 287. This arc-shaped area covered the entire eastern border of the tract. I find that Mahwah failed to demonstrate by a fair preponderance that the level of use therein rose to that required, for the same reasons as previously set forth. This area was apparently randomly used for the orienteering courses, by ecology students and for cross-country running. Nonetheless, I find that the accumulation of “uses” does not aggregate to that level necessary to qualify. In so finding I note that there appeared to be a sufficient amount of evidence indicating a level of use that would be in accordance with the standard found in the rebate statute with respect to the area due east of the maintenance shed and located in this right-of-way. I would be inclined to so hold, but for the fact that later Mahwah offered no evidence that would permit this court to excise this property from the right-of-way. Therefore I am constrained to find this area not to be so used, simply out of the sheer impossibility of determining the amount of acreage therein.
With respect to the remaining 44 acres of the perimeter area I find, as was the case with the other “used” areas, that the testimony in the aggregate supports a finding that Mahwah met the fair preponderance test. The unrefuted testimony of the various faculty members clearly indicated that this remaining area was sufficiently utilized for both academic and nonacademic purposes so as to satisfy the statutory mandate.
*543 In summary, then, 129 acres of this perimeter area cannot be considered used within the meaning of the rebate statute. Thus, to put the proposition in the positive, 44 acres of said area will be added to the total of 176.28 acres in 1974-1975 and 204.34 acres in 1976 — 1977 which have already been determined to be used for the purposes of the rebate statute. Adding in the 24.98 academy acres the total area used, was 240 acres and 268 acres in 1974 — 1975 and 1976-1977, respectively. Based on the foregoing it is apparent that Mahwah qualifies for the rebate. For each year the total acreage “used” exceeds the 200-acre minimum.
In view of the foregoing this court must address the constitutional issues raised by the parties. I will first address the constitutionality of the supplemental act due to the fact that if it is constitutionally sound Mahwah’s claims will be dismissed and the rebate statute will be otherwise preserved intact.[12]
Mahwah contends that the supplement is unconstitutional by virtue of its being a special law violative of Art. IV, § VII, par. 8, of the New Jersey Constitution and that it unconstitutionally deprives it of vested rights in a retroactive manner, in contravention of established principles of constitutional law. As for the argument regarding retroactivity, Mahwah does not focus on one specific state or federal constitutional provision, yet apparently alleges that the supplement deprives it of a vested property right in the sense of maintaining a cause of action to vindicate rights under the main body of the rebate statute. *544 Such an attack, at the very least, arguably implicates due process of law.
Initially it is noted that the law is still unsettled whether a taxing district has standing to raise due process objections vis-a-vis the State. See, generally, McKenney v. Byrne, 82 N.J. 304, 315, 412 A.2d 1041 (1980). The same can be said for the constitutional attack based on the state constitutional provisions. McKenney v. Byrne, supra. But see Glassboro v. Byrne, 141 N.J.Super. 19, 357 A.2d 65 (App.Div.1976), certif. den. 71 N.J. 518, 366 A.2d 674 (1976), where it was explicitly stated that an equal protection attack cannot be maintained by a municipality.
In Salorio v. Glaser, 82 N.J. 482, 414 A.2d 943 (1980), the Supreme Court held that:
Our state constitution contains no analogous provision [analogous to the federal constitutional provision regarding case or controversy] limiting the subject matter jurisdiction of the Superior Court. See New Jersey Constitution (1947), Article VI, Sec. 3, Par. 2. This court remains free to fashion its own law of standing consistent with notions of substantial justice and sound judicial administration. We therefore find it unnecessary to consider whether federal standing requirements have been met. [at 490, 414 A.2d 943; footnote omitted]
The court further stated:
We have consistently held that in cases of great public interest, any “slight additional private interest” will be sufficient to afford standing, [at 490, 414 A.2d 943; citation omitted].[13]
Consequently, by virtue of the profound public interest implicated herein and because of the presence of a private interest, however slight with respect to the individual taxpayers-intervenors, this court finds that it must address these constitutional issues. McKenney v. Byrne, supra 82 N.J., at 315, 412 A.2d 1041, n. 4. See, also, Koons v. Atlantic City, 134 N.J.L. 329, 47 A.2d 589 (Sup.Ct.1946), aff’d 135 N.J.L. 204, 50 A.2d 869 (E. & A. 1947).
*545 With respect to the claim of special legislation, the test to determine whether a statute is special legislation was stated in Harvey v. Essex Cty. Freeholders Bd., 30 N.J. 381, 153 A.2d 10 (1959), as follows:
In deciding whether an act is general or special, it is what is excluded that is the determining factor and not what is included. Budd v. Hancock, 66 N.J.Law 133, 135-136, 48 A. 1023 (Sup.Ct.1901). If no one is excluded who should be encompassed, the law is general. Another requirement of the general law is that it must affect equally all of a group who, bearing in mind the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves. In Van Riper v. Parsons, 40 N.J.Law 1, 9 (Sup.Ct.1878) the court pointed out that local and especial laws rest on a false or deficient classification in that “their vice is that they do not embrace all the classes to which they are naturally related; they create preference and establish inequality; they apply to persons, things or places possessed of certain qualities or situations, and exclude from their effect other persons, things or places which are not dissimilar in these respects." See also City of Passaic v. Consolidated Police, Etc., Pension Fund Commission, 18 N.J. 137, 146, 113 A.2d 22 (1955); Sherwood v. Bergen-Hackensack Etc. Authority, 24 N.J.Misc. 48, 53-54, 46 A.2d 151 (Sup.Ct.1946) aff’d. 135 N.J.Law 304-306, 51 A.2d 197 (E. & A. 1946). With this distinction between a special and a general law in mind, the question is whether any appropriate person is excluded to which the law, but for its limitations, would apply. Koons v. Board oí Commissioners of Atlantic City, 135 N.J.Law 329, 333, 47 A.2d 589 (Sup.Ct.1946) aff’d. per curiam 135 N.J.Law 204, 50 A.2d 869 (E. & A. 1947); In Re Freygang, 46 N.J.Super. 14, 23, 133 A.2d 672 (App.Div.1957), aff’d. 25 N.J. 357, 136 A.2d 625 (1957). [at 389, 153 A.2d 10]
In Vreeland v. Byrne, 72 N.J. 292, 370 A.2d 825 (1977), the method of analyzing such constitutional attacks was succinctly set forth:
Briefly restated, the method of analysis is this: we first discern the purpose and object of the enactment. We then undertake to apply it to the factual situation presented. Finally we decide whether, as so applied, the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act. [at 300, 370 A.2d 825]
It is clear from the controlling authority that the analysis of purported special legislation does not substantially differ from the analysis of noninvidious classifications under the Equal Protection and Due Process clauses. At the heart of all such cases is the rational relationship between the legislative objects and the means employed to achieve the objects. See Bonnet v. State, 155 N.J.Super. 520, 382 A.2d 1175 (App.Div.1978), motion for summary affirmance granted 78 N.J. 325, 395 A.2d 194 *546 (1978), and Raybestos-Manhattan, Inc. v. Glaser, 144 N.J.Super. 152, 365 A.2d 1 (Ch.Div.1976), aff’d 156 N.J.Super. 513, 384 A.2d 176 (App.Div.1978). Mahwah maintains that the unequivocal objects of this legislation is to deprive it of the refund under the rebate statute. It further argues that the supplement especially seeks to allow a rebate to the only taxing district now receiving a rebate thereunder (Cedar Grove in Essex County) in spite of the arguably sound claims made under the rebate statute by Mahwah and Paramus in Bergen County.[14] It concludes that such a course of action is not justifiable under any rationale.
The defendants argue that the purpose of the supplement clearly was to disallow a rebate to otherwise qualified Bergen County municipalities. Yet they maintain that the Legislature acted reasonably in enacting the supplement. Their position in terms of reasonableness of the supplement is based on two propositions purportedly animating the Legislature to enact such a provision. First, they state that the county tax contributions by constituent municipalities in Bergen County are substantially lower than the Essex County contributions. Secondly, they argue that since Bergen County has 70 constituent municipalities while Essex County has only 22, the county tax burden imposed on the Essex County municipalities is obviously much greater than those in Bergen. They thus conclude that the Legislature determined to permit the rebate only to the one qualifying municipality in Essex County, namely Cedar Grove.
Defendants candidly concede that the supplement created a class of one and yet maintain it is a reasonable legislative response to a unique set of facts.[15] Put another way, defend *547 ants argue that the class of one created by the supplement does not exclude any other taxing districts that may resemble (but in fact only superficially) the included member — Cedar Grove. This results, according to defendants from the unique traits inherent in Cedar Grove’s status that, in the Legislature’s view, required a “repair” of the then existing rebate statute in order to effectuate its underlying purpose. The appeal of defendants’ argument disappears upon an analysis of this supplement in light of its ostensible purpose.
A county is a creature of the State, Clark v. Degnan, 83 N.J. 393, 416 A.2d 816 (1980), and as such is necessarily subordinate to the State in terms of its financial affairs. Camden v. Byrne, 82 N.J. 133, 411 A.2d 462 (1980). In this State all constituent municipalities of a county contribute proportionately to the maintenance of their county government. This county tax contribution (sometimes erroneously called a “county tax”) is based on the equalized valuation of real estate within the borders of constituent municipalities making up the respective counties. This equalization procedure is supervised by the county tax administrators and is achieved through the promulgation of an equalization table, N.J.S.A. 54:3-17, which, after confirmation by the county tax boards, is used to apportion the county contribution among constituent municipalities. N.J.S.A. 54:3-19. This county contribution is not exacted directly from the individual citizens of a municipality but is diverted from the collection of the local property tax by the municipal government.
The rebate statute, putting aside the effect of the supplement, is an attempt to divert from one municipality the cost of maintaining state- or county-owned institutions that are used for public purposes, to constituent municipalities of a first class county having a population in excess of 800,000. The *548 Legislature made a policy decision to spread the burden of servicing said institutions over the region, according to county lines, in an obvious attempt to relieve these taxing districts in which the institutions are located. The apparent design of the rebate statute is essentially one of the apportionment of a share of local property taxes.
Thus, according to defendants, the Legislature by way of the supplement sought to alleviate the oppressive county tax contribution burden of certain Essex County municipalities by limiting the rebate statute to that county. In short, the purpose of the supplement was to effectuate the underlying purposes of the rebate statute. This argument is fallacious in two respects.
Initially, the text of the supplement effectively deprives any municipality, even a municipality located in Essex County other than Cedar Grove, of ever receiving a rebate. The supplement states, in pertinent part:
No taxing district which has not actually received a remission or a rebate ... for any full year occurring prior to the effective date of this act [September 22, 1980], shall receive a remission or rebate under that section for the current tax year or any other tax year whether occurring prior to or after the effective date of this act [Emphasis supplied]
This feature itself destroys the argument in support of the supplement. If the Legislature’s purpose was to give some intra -county relief to worthy municipalities in only Essex County, it defies common sense to expressly exclude such hard-pressed Essex County municipalities as Newark or East Orange.
Secondly, the diversion of county tax contributions to municipalities such as Cedar Grove actually increases the county tax burden of other constituent municipalities not receiving a rebate. Thus, by virtue of certain municipalities receiving said rebate, a hard-pressed taxing district is further burdened by a proportionate increase in its county tax contribution.[16]
*549 Consequently, the classification cannot be said to result from a rational basis. It clearly attempted to benefit a class closed to other excluded members which are similarly situated in accordance with the unsupplemented rebate statute. No conceivable rationale can be tendered to justify this retroactive deprivation of class membership. While the Legislature could have simply repealed the rebate act, an action which would have affected every single class member in a uniform, consistent manner, it sought in this case to nonsuit an otherwise qualified rebate candidate merely on the basis of caprice.
The defendants claim that the recent case of McKenney v. Byrne, supra, sufficiently analogous to control the instant matter. There various individuals attacked the apportionment scheme of the Public Utilities Gross Receipts Tax Act (N.J.S.A. 54:30A-49 et seq.) and specifically the apportionment mandate found in N.J.S.A. 54:30A-54(b) which apportions a llh% tax on gross receipts from business “over, on, in through or from its lines or mains” based on scheduled property located within the taxing district. Thus, taxing districts without such scheduled property obviously do not share to the same extent as do other taxing districts which are “rich” in such scheduled property.[17] The Supreme Court denied relief based primarily on an equal protection analysis because there were conceivably sound rationales for this allocation scheme. Id. 82 N.J., 317-320, 412 A.2d 1041. It further held:
Plaintiff’s contention that the allocation provision, N.J.S.A. 54:30A-61, is a special or local law violative of the New Jersey Constitution (1947), Article IV, *550 Sec. 7, Par. 9(6) and 9(13), because it relates to taxation and regulates the internal affairs of municipalities, is without merit. The statute is not a special or local law because the classification is constitutionally reasonable, or within the group of characteristics which are sufficiently identifiable so that they constitute a class, and none has been excluded which should have been encompassed within the classification. See Alfred Vail Mutual Association v. New Shrewsbury, 58 N.J. 40, 48-49, 274 A.2d 801 (1971). [at 320, 412 A.2d 1041]
McKenney is obviously distinguishable since the court found sound bases for the legislation in question. The court specifically stated the class created by the legislation did not exclude those who should have been included in the first instance. The Alfred Vail decision, cited in McKenney, is more closely analogous to the instant matter.
In Alfred Vail Mut. Ass’n v. New Shrewsbury, 58 N.J. 40, 274 A.2d 801 (1971), the Township of New Shrewsbury and the largest taxpayer therein attacked L.1965, c. 175 (incorporated into N.J.S.A. 18:8-17.2 and superseded by N.J.S.A. 18A:13-23) which mandated that common school district costs be apportioned in certain common school districts upon the basis of the number of pupils per the constituent taxing districts, and not on the basis of the past method that was based upon the respective assessed valuations of real property within the taxing districts that composed the common school districts. In revising the apportionment scheme the Legislature classified such qualifying school districts in the following terms:
First, at some point in its history, the school district must have been a consolidated school district comprised of exactly two municipalities. Second, after January 1,1957, the school district, while it was still a consolidated district comprised of exactly two municipalities, must have joined in the formation of a regional high school district. Third, by subsequently regionalizing the consolidated school district for other school purposes, the school district must have ceased to operate as a consolidated school district, continuing instead as a regional school district, [at 44, n. 3, 274 A.2d 801].
In holding this provision to be special the court initially noted that “the Legislature is necessarily accorded broad discretion in the area of permissible classification. . . [yet] the classifications, however, must be germane to the purpose of the enactment, resting on characteristics that substantially differentiate the school district included from those school districts excluded from the coverage of the statute.” Id. 48-49, 274 A.2d 801. The *551 essence of the determination that the legislation was special is contained in the following:
Clearly, a classification based on the historical temporal order of regionalization and the chance that the school district is comprised of exactly two municipalities rather than two or more governmental units has no rational relationship to the purpose of the statute which is to equalize the financial burden on constituent members of regional school districts, [at 50, 274 A.2d 801]
While this case is not controlling, it persuasively demonstrates that a legislative class must have a reasonable nexus to the objects of the legislation. I am unable to find any conceivable rationale as to the classification inherent in the provision in question other than a capricious retroactive deprivation of the benefit of a rebate. I accordingly hold that the supplement is unconstitutional special legislation. Accord Allendale Nursing Home, Inc. v. Allendale, 141 N.J.Super. 155, 160-161, 357 A.2d 333 (Law Div.1976), aff’d 149 N.J.Super. 286, 373 A.2d 714 (App.Div.1977). To say that the Legislature intended to supplement the spirit and letter of the rebate statute with this provision is to ignore substance over form. It simply cannot be said that the purpose of this supplement effectuates the underlying purpose of the rebate statute itself.
Still to be considered is the constitutionality of the rebate statute per se, but we must first address the issue regarding the severability of the supplement from the main body of the rebate statute.
The rule of severability was succinctly set forth in Affiliated Distillers Brands Corp. v. Sills, 60 N.J. 342, 289 A.2d 257 (1972):
Severability is a question of legislative intent. That intent must be determined on the basis of whether the objectionable feature of the statute can be excised without substantial impairment of the principle object of the statute. 56 N.J. at 265, 265 A.2d 809; N.J. Chapter Am. I.P. v. N.J. State Board of Professional Planners, 48 N.J. 581, 593, 227 A.2d 313 appeal dismissed and cert. denied, 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967); Angermeier v. Boro. of Sea Girt, 27 N.J. 298, 311, 142 A.2d 624 (1958). To justify severance of a part of a statute “there must be such a manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative.” Washington National Insurance Company v. Board of Review, 1 N.J. 545, 556, 64 A.2d 443 (1949); Yanow v. Seven Oaks Park, Inc., 11 N.J. 341, 361, 94 A.2d 482 (1953). [at 345-346, 289 A.2d 257]
*552 The supplement cannot be construed as a substantive alteration of the rebate statute. It was, indeed, supplementary in the truest sense of that word and I accordingly hold it to be severable from the rebate provision in its unsupplemented form. The purported underlying intent of the rebate statute simply indicates that the level of interdependence that is necessary for this court to find the whole scheme inseparable is not present. For that matter, the conceded intent of the supplement likewise does not indicate that level of interdependence necessary for a finding of inseparability.
Defendants initially mounted a constitutional attack on the main body of the rebate statute based on several state constitutional provisions and the Fourteenth Amendment to the United States Constitution. The state constitutional provisions invoked are Art. IV, § VII, par. 9, and Art. VIII, § I, par. 1 and par. 2. The cited provisions found in Art. VIII are clearly inapplicable since they concern uniformity in taxation in terms of assessment and exemptions. The clear import of these provisions is to address taxation in terms of mandating uniformity so that individual taxpaying entities are. not accorded preferential treatment. See Bonnet v. State, supra, 155 N.J.Super. at 531— 534, 382 A.2d 1175. Counties are not taxpayers; they merely remit taxes paid by individual taxpayers so that these provisions are not controlling. See Clifton v. Passaic Cty. Bd. of Taxation, 114 N.J.Super. 253, 276 A.2d 148 (App.Div.1971), aff’d, per curiam 60 N.J. 185, 287 A.2d 449 (1971), and Jersey City v. Martin, 126 N.J.Law 353, 19 A.2d 40 (E. & A. 1941).
The same cannot be said for the special legislation clause found in Art. IV. At least two clauses within paragraph 9 are arguably implicated. Paragraph 9 provides in pertinent part that “the Legislature shall not pass any private, special or local law”; it then proceeds to enumerate the forbidden subjects. Clause 6 forbids such laws “relating to taxation or exemption therefrom,” while clause 13 forbids such laws “regulating the internal affairs of municipalities formed for local governments and counties, except as otherwise in this Constitution.”
*553 Defendants argue that the rebate statute classifies potential beneficiaries of a rebate in terms of an invalid population and acreage requirement. They argue that a special class is created, clearly demonstrating that the rebate statute is a special law passed only for the purposes of according arbitrary, preferential treatment to certain municipalities. In short, they contend the classification is too restrictive, bearing in mind the underlying purpose of the statute.
In assessing legislative classifications it has been said repeatedly that the Legislature is accorded extremely broad discretion with respect to tax matters. Lehnhausen v. Lake Shore Auto Parts, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973); Bonnet v. State and Jersey City v. Martin, both supra. It is virtually beyond question that the Legislature can exercise this broad discretion in a particularly liberal fashion in matters of the apportionment of tax revenue. McKenney v. Byrne, supra, and Meadowlands Reg’l Redevelop. Agency v. State, 63 N.J. 35, 304 A.2d 545 (1973), app. dism. 414 U.S. 991, 94 S.Ct. 343, 38 L.Ed.2d 230 (1973); but see Jersey City v. Zink, 133 N.J.L. 437, 44 A.2d 825 (E. & A. 1945), cert. den. 326 U.S. 797, 66 S.Ct. 493, 90 L.Ed. 485 (1946). Nonetheless, defendants contend that this statute, which is in effect a scheme of apportioning the costs of county government, contains improper classifications of population and land area and consequently is an unconstitutional diversion of one taxing district’s revenue to another. Defendants place great reliance on Jersey City v. Zink, supra, a case which is very similar to the instant matter.
In Jersey City certain class 2 railroad taxpayers had defaulted on their local property taxes but paid into the state treasury the principal and interest due thereon. Jersey City made demand on the state for the interest and the principal based on such property situated in Jersey City. The State paid over the principal but not the interest. Roughly six months later the Legislature passed L.1945, c. 4, 5, 6 and 34, which made specific appropriations of the interest paid according to the already disbursed principal. According to these provisions, certain sums were to be paid to taxing districts which had already received *554 distribution of the delinquent principal; other sums were to be paid to various school districts in the State and, finally, sums were to be paid to every municipality in this State. The last two classes of beneficiaries were to receive the funds without consideration of whether or not they too had class 2 railroad property therein.
The Court of Errors and Appeals held in a 8-5 decision that this legislative scheme was unconstitutional, special legislation violative of Art. IV, § VII, par. 11, of the New Jersey Constitution (1844).[18] The court initially observed that class 2 railroad property is included in the aggregate valuation of railroad property in the respective taxing districts and is, of course, used to strike a tax rate. Furthermore, it recognized that
The fixing of a rate is an essential part of the taxing power. A local tax rate in a taxing district of this state is determined annually and increases or decreases in approximately direct proportion to the cost of local government. The principles of taxation and representation go together which applies here. Van Cleve v. Passaic Valley Sewage Commission, supra (71 N.J.L. at p. 584, 60 A. 214), has genesis in the right of a citizen to choose by ballot the officers of the taxing district for whose public purposes he is taxed and a citizen can thereby control the expenditures and cost of government in that district. Van Riper v. Parsons, 40 N.J.Law 1 (at p. 5). [Id. at 446, 44 A.2d 825]
The crux of the holding is as follows:
Under this provision of the Constitution, the state may not arbitrarily take funds from one municipality and allot them to another, nor arbitrarily require a group of municipalities to contribute from their tax revenues to the support of the state government and absolve others from the same obligation, especially where the diverted funds are derived from assessment levied upon local properties. Nor may the state call upon the municipalities, or some of them, to turn it over, for state purposes, or for disbursement to other municipalities, monies raised by local taxation upon a specified class of property, such as farmlands, public utilities or any other special class, for thereby would be created a grossly disproportionate sharing of a common obligation and some would escape it entirely.
[moreover] The sole criteria, in these statutes, of the obligation to contribute monies for general state or state school purposes is the legal right to receive tax monies from a particular kind of assessed ratable and all municipalities which are not in this category are exempt from the obligation of making contributions, [at 447 — 448, 44 A.2d 825]
*555 While the language of this case appears to control the instant matter it is important to note that central to the holding was the premise that the interest calculated in accordance with the principal in default was deemed to be the property of each plaintiff-taxing district therein. Id. at 441-444, 44 A.2d 825. The dissent of Justice McGeehan eloquently called this proposition into question (at 456-460, 44 A.2d 825) and further noted:
The importance of the constitutional question of the relative rights of the Judiciary and the Legislature involved in this case, far transcends the admitted importance of the case itself to the municipalities in the state. Even though the equities may be all on one side in a given case, these equities may not be put in the scale to increase the measure of judicial power. It is the duty of the Judiciary to see that no one department of government encroaches on the prerogatives of another. 16 C.J.S. 430. By the same token, the judicial branch of the government cannot encroach on or interfere with the legislative branch in the proper exercise of its constitutional powers either by enacting, amending or nullifying laws or by judicial construction. 16 C.J.S. 446. It is the Legislature and not to the courts that our constitution has granted the power to make appropriations and except for constitutional inhibitions in the power, the Legislature is answerable to the people alone for any unjust or unwise exercise of its power. In matters of appropriation particularly, the courts never should read into any appropriation act an inclusion not clearly required. It must be remembered that an error committed in extending an appropriation act by judicial construction cannot be remedied, while an error on the part of the court in restricting the effect of any appropriation act is always open to correction by the Legislature. [461-462, 44 A.2d 825]
This case has caused many subsequent decisions to limit the holding of it to the facts found therein. See, e. g., Meadowlands Reg’l Develop. Agency v. State, 112 N.J.Super. 89, 110-113, 270 A.2d 418 (Ch.Div.1970), aff’d 63 N.J. 35, 304 A.2d 545 (1973); Bonnet v. State, supra, 141 N.J.Super. at 204, 357 A.2d 772; McKenney v. Byrne, supra, 147 N.J.Super. 158, at 166, 370 A.2d 897 (Law Div. 1976); Clark v. Byrne, supra, 165 N.J.Super. at 111, 397 A.2d 719, and finally, Camden v. Byrne, supra, 82 N.J. at 157, 411 A.2d 462, where the court implied that the Jersey City case was decided on less than solid grounds.
The Camden case recognized the tension between the Jersey City case and contemporary authority by stating that political subdivisions are necessarily subordinate to the State, so that, “They may complain of the financial niggardliness of their parent, but they are in no position to defy its authority. See *556 Glassboro v. Byrne, supra, 141 N.J.Super. at 24, 357 A.2d 65.” 82 N.J. at 157-158, 411 A.2d 462. The vitality of this case remains in its recognition that certain taxing districts having a particular ratable were coerced into contributing public funds (interest ineluctably linked to tax principal) for the benefit of the entire State by virtue of a special allocation scheme. There was simply no reason to find any reasonable basis for the diversion of such funds; purely and simply, it was the confiscation of municipal revenue derived from local property taxes. The bedrock of the case was the principle that tax revenue generated within the borders of a taxing district cannot be “enjoyed” by other entities not proportionately sharing in the governmental burden of that taxing district.
Defendants are simply saying that the Legislature cannot demand that sister taxing districts support another taxing district, in terms of a rebate of the county tax contribution, because of the presence of 200 or more acres of a state or county institution. The court disagrees. The state or county institutions “used for public purposes” are undeniably maintained for the welfare of the public in general. The Legislature, in its wisdom, declared that taxing districts burdened with the cost of servicing such institutions should be recompensed along county lines. This court is not authorized to pass on the wisdom of such a scheme nor am I able to state that such legislation is arbitrary or irrational. Accord Meadowlands Reg'l Redevelop. Agency v. State, supra, 63 N.J. at 44, 304 A.2d 545. Compensation through direct state payments may be a better alternative, but this court is constrained to hold that there is a conceivable rational basis for the statute as it exists. This conclusion, however, still does not answer the real alleged defect in the rebate statute which was not fully articulated by the parties herein.
The root question concerns the condition precedent within the rebate statute which accords relief to qualifying municipalities only in counties of the first class. This question concerns the excluded class of potential beneficiaries of the rebate statute by virtue of a county population requirement vis-a-vis the legitimate purpose of reapportioning the cost of bearing a substantial *557 institution that is used for public purposes. In other words, the alleged excluded classes are those municipalities having such institutions which are simply not located in first class counties.[19]
The leading case of Koons v. Atlantic City, supra, set forth the controlling principle regarding population requirements:
Thus, population forms a valid basis of classification in statutes relating to the structure and machinery of municipal government only “where population bears a reasonable relation to the necessities and proprieties of the various grades of municipal government.” Lewis v. Jersey City, supra. In applying the general rule adverted to, Chief Justice Depue declared that the classification is exclusive unless it is founded on “some characteristic or peculiarity plainly distinguishing the places included from those excluded and making the legislation fit and appropriate to those included and inappropriate to those which are omitted. It must embrace all and exclude none, whose condition and wants render such legislation equally appropriate to them as a class.” And in Lowthorp v. Trenton, 61 N.J.Law 484, 40 A. 442, aff’d. 62 N.J.L. 795, 44 A. 755, 756, the Court of *558 Errors and Appeals held that “population bears a reasonable relation to the subject matter of the legislation ... only when such legislation deals with the structure or machinery of municipal government. Classification on the basis of population for any other purpose than those mentioned is illusive and unsubstantial and consequently is within the constitutional prohibition.” [134 N.J.L. at 333-334, 47 A.2d 589]
Accord, Sarner v. Union Tp., 55 N.J.Super. 523, 151 A.2d 208 (Law Div. 1959).
The Legislature is unquestionably vested with the authority to classify the political subdivisions of the State in terms of population so that the State’s populous counties, and municipalities contained therein, may be treated more favorably than less populous counties as long as the legitimate purpose of the legislation reasonably justifies such a preference. Bergen Cty. Sewage Auth. v. Little Ferry, 7 N.J.Super. 213, 72 A.2d 886 (App.Div.1950). However, I find no such justification here. For example, in 1977, according to the figures tendered by the Attorney General, such second class counties as Camden, Mercer, Middlesex, Morris, Passaic and Union, as well as the fifth class counties of Monmouth, Ocean and Atlantic, have county tax contributions as follows:
Camden $60,222,289.78
Mercer 38,279,873.25
Middlesex 62,159,256.08
Morris 35,696,729.32
Passaic 38,783,537.48
Union 44,752,145.81
Monmouth 44,892,585.18
Ocean 26,454,663.75
Atlantic 20,603.040.50
Noting that the total contribution of the 70 municipalities to Bergen County was $64,408,681.87, it can be readily seen that the amount of contribution cannot serve as a basis for excluding municipalities in less populous counties. Furthermore, it is entirely possible, and perhaps probable, that the proportionate burden in municipalities located in non-first class counties having in excess of 200 acres of county or state property may even be greater than Mahwah, Paramus or Cedar Grove. While the further exclusion of those municipalities in first class counties *559 having 800,000 or less people is even more invidious,[20] I find that the general applicability to first class county municipalities alone bears absolutely no rational relationship to the purpose of the rebate statute. The denial of the relief from the impact of servicing public property to taxing districts in other counties clearly is an attempt to construct a restrictive class bearing no relationship to the machinery or structure of municipal or county government. The clear purpose underlying this statute is not served by the exclusion of the members of a class that should have been included in the first instance. Consequently, I hold the rebate statute to be special legislation and thus violative of the constitutional command found in Art. IV, § VII, par. 9.
For the foregoing reasons the claims of Mahwah for all years in question are dismissed. The Clerk of the Tax Court shall enter judgment accordingly.

Before trial various individual taxpaying citizens of defendant municipalities were also allowed to intervene on the same theory. After trial various individual taxpayers of plaintiff were allowed to intervene for the same reason.

 Z,. 1980, c. 118 became effective September 22, 1980, subsequent to the close of testimony.

Additional motions addressing discovery demands, the intervention of another Deputy Attorney General to defend the constitutionality of the rebate statute, and the taking of judicial notice regarding the distribution of county and state institutions throughout the State were heard and disposed of by separate order.

N.J.S.A. 54:4-52 provides that each county board shall, on or before April 10 (changed to May 3 in 1979), adopt a Table of Aggregates.

For the 1980 tax year a complaint was filed directly in the Tax Court.

Earlier mention was made of the post-trial attack on the constitutionality of the supplement to N.J.S.A. 54:4-5, L.1980, c. 118. Even though defendant asserted it was dispositive of the instant matter, Mahwah asserted that it was unconstitutional; the same principle of judicial restraint applies a fortiori.

Cedar Grove has annually qualified for and received a rebate on the basis of a hospital located therein.

The effective date of the new act was July 1, 1977. Consequently, payments did not commence until the 1978 tax year. Such is the case here as to Mahwah. No evidence was adduced that established Mahwah ever received such payments before 1978.

The second section regarding water supply property was added by L. 1910, c. 118, p. 199; the third section regarding Morris Canal and Banking property was added by L. 1924, c. 77, pp. 150-151.

The amount of acreage of the Police and Fire Academy was in dispute; Mahwah maintained the property consists of 26.7 acres while defendants maintain 24.98 was the correct area. I will adopt defendants’ figure.

This area is not “state property” within the meaning of the Payments in Lieu of Taxation Act, N.J.S.A. 54:4-2.2a. Consequently, this state-owned property is unquestionably exempt under the Public Property Act, N.J.S.A. 54:4-3.3.

Support for this approach is found in Schaad v. Ocean Grove Camp Meeting Ass’n, 72 N.J. 237, 251, 370 A.2d 449 (1977), overruled on other grounds in State v. Celmer, 80 N.J. 405, 404 A.2d 1 (1980):
Where there is more than one potential constitutional basis for invalidation of a restriction based upon a statute and a dependent ordinance, as here, a court should, lean toward that ratio decidendi a judgment which will save as much of the statute and ordinance or of the range of their application, as possible, and rest its invalidation thereof on the narrowest basis consistent with relief to the successful suitor.
This proposition is a corollary of the previously discussed “rule of necessity.”

In Kenney v. East Brunswick, 172 N.J.Super. 45, 410 A.2d 713 (App.Div.1980), it was held that a municipality had standing to contest legislation as a special law since it might have been required to expend public funds therefrom. Furthermore, and of particular importance herein, the municipality challenged the constitutionality of the provision by way of a defense. Based on these grounds the Appellate Division held the municipality did have standing under the facts of that case.

Paramus’ appeal pursuant to the rebate statute is currently pending in the Tax Court. The Tax Court, J. Hopkins, recently declared the supplement to the rebate statute unconstitutional. 2 N.J.Tax 479 (Tax Ct.1981).

It is important to remember that the size of the class is not relevant to the constitutional inquiry. Clark v. Byrne, 165 N.J.Super. 98, 397 A.2d 719 (Law Div.1978), aff’d 165 N.J.Super. 16, 397 A.2d 685 (App.Div.1979). The critical inquiry is the purpose behind the creation of a limited class, vis-a-vis similarly affected potential class members. The test is whether the statutory class has *547 a logical and reasonable basis, free from artificiality and arbitrariness, embracing all and omitting none naturally falling into that category. Koons v. Atlantic City, supra, 134 N.J.Law at 332, 47 A.2d 589.

These observations are fully supported by the record herein by virtue of the testimony of the Bergen County Tax Administrator, who fully explained the mechanics of county tax contributions and apportionment. He vividly demonstrated the impact on other constituent taxing districts that bear the burden of a rebate to a sister taxing district. He testified that the county tax *549 administrator simply takes the equalized value of real estate for the entire county and strikes it against the budget supplied to him by the Board of Freeholders in order to get a tax rate. He then takes the tax rate and applies it uniformly to the equalized valuation of real estate for each taxing district. A rebate would decrease that taxing district’s county tax contribution in ensuing years and would obviously result in a proportionate increase of the county tax contribution of the remaining taxing districts within that county.

Scheduled property is defined in N.J.S.A. 54:30A — 50(d) and essentially is various capital improvements used in the processing and distribution of utilities to consumers.

This provision is the source for Art. IV, § VII, par. 9 of the New Jersey Constitution (1947), which, of course, is the provision alleged to be controlling herein.

N.J.S.A. 40:17-2 provided: “Counties of the first class shall consist of all counties having a population exceeding 600,000; counties of the second class, except as herein otherwise provided, shall consist of all counties having a population of not less than 200,000 nor more than 600,000; counties of the third class, except as herein otherwise provided, shall consist of all counties having a population of not less than 50,000 nor more than 200,000; counties of the fourth class, except as herein otherwise provided, shall consist of all counties having a population of less than 50,000; counties of the fifth class shall consist of all counties bordering on the Atlantic Ocean and having a population exceeding 100,000; counties of the sixth class shall consist of all counties bordering on the Atlantic Ocean and having a population not exceeding 100,000.”
Repealed by N.J.S.A. 40A:6-1 which provided: “For legislative purposes, counties are classified as follows based upon their population as ascertained by the most recent Federal decennial census:
a. First class — counties having a population of more than 600,000;
b. Second class — counties having a population of not less than 200,000 but not more than 600,000 except such counties bordering on the Atlantic Ocean;
c. Third class — counties having a population of not less than 50,000 but not more than 200,000 except such counties bordering on the Atlantic Ocean;
d. Fourth class — counties having a population of less than 50,000 except such counties bordering on the Atlantic Ocean;
e. Fifth class — counties bordering on the Atlantic Ocean having a population of not more than 100,000.
f. Sixth class — counties bordering on the Atlantic Ocean having a population of not more than 100,000.”
T.1979, c. 181, § 1, eff. August 29, 1979.

This provision excludes Hudson County municipalities. In all years in question it was a first class county, but its population was less than 800,000 people.